## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Riverside Church,                                    Civil No. 15-1575 (DWF/JSM)

        Plaintiff,

v.

                                 **MEMORANDUM**
City of St. Michael,                                 **OPINION AND ORDER**

        Defendant.
_____

Dean A. LeDoux, Esq., Matthew P. Webster, Esq., and Samuel W. Diehl, Esq., Gray Plant Mooty Mooty & Bennett, PA; and G. Craig Howse, Esq., and Jacob R. Grassel, Esq., Howse & Thompson, PA, counsel for Plaintiff.

George C. Hoff, Esq., and Jared D. Shepherd, Esq., Hoff, Barry & Kozar, P.A., counsel for Defendant.
_____

## INTRODUCTION

Plaintiff Riverside Church (the "Church") sued Defendant City of St. Michael (the "City") after the Church tried, without success, to purchase a former movie theater (the "Theater Property") for religious worship. At the time, the City's zoning ordinance prohibited churches in the district where the Theater Property was located. When the Church petitioned the City to amend the zoning ordinance to allow churches as a permitted use in the district, the City denied the petition. After the Church filed this lawsuit, however, the City amended the zoning ordinance to permit churches as conditional uses in the district, and it granted the Church a conditional use permit.

In this lawsuit, the Church challenges the former zoning ordinance under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc-5 ("RLUIPA"), and the First Amendment to the U.S. Constitution.  It also asserts a defamation claim related to the City's statements about the Church's petition to amend the zoning ordinance.  Presently, the Church seeks partial summary judgment, asserting that the Court should rule in its favor—with respect to liability but not damages—on two claims:  (1) violation of RLUIPA's equal terms provision, 42 U.S.C. § 2000cc(b)(1); and (2) violation of the right to free speech and assembly under the First Amendment.  The City seeks summary judgment on all of the Church's claims against it.

For the foregoing reasons, the Court denies the Church's motion, grants the City's motion as to the Church's RLUIPA and free exercise claims, and denies the City's motion as to the Church's speech and defamation claims.  The Court also dismisses the Church's claims for declaratory and injunctive relief as moot.

## BACKGROUND

### I.    The City's Zoning Ordinance

The zoning ordinance at issue in this case is codified at St. Michael, MN, Code of Ordinances §§ 155.001-155.999 (the "Zoning Ordinance").[1]  The purpose of the Zoning Ordinance is, in relevant part, "to provide for the orderly, economic, and safe

---

[1]     The online version of the Zoning Ordinance that is currently available to the Court and the public reflects the Zoning Ordinance in effect from January 28, 2014 to September 9, 2014.  It does not reflect amendments to the Zoning Ordinance adopted on September 9, 2014 or later.  For simplicity, the Court's citations to the Zoning Ordinance are to this online version.

development of land and urban services and facilities and to promote the public health

and safety . . . and to promote the general welfare of the inhabitants of the city." Zoning

Ordinance § 155.002.  To that end, the Zoning Ordinance divides the City into thirteen

districts, including agricultural, residential, business, and industrial districts.  *Id.*

§§ 155.002, 155.100.  The district at issue in this case is B-1, the General Business

District, whose purpose is:

> [T]o provide appropriately located lands for the full range of business uses
> needed by the city's residents, businesses, and workers, consistent with the
> Comprehensive Land Use Plan; to strengthen the city's economic base and
> provide employment opportunities close to home for residents; and to
> create suitable environments for various types of business, office, and retail
> uses.

*Id.* § 155.205.

For many districts, including B-1, the Zoning Ordinance authorizes certain

categories of land use as "permitted" or "conditional."  *Id.* § 155.105.  The Zoning

Ordinance allows permitted uses within a given district, subject to other City ordinances,

but requires conditional use permits for conditional uses.  *Id.* §§ 155.009,

155.105(B)(2)(c), 155.440.  On January 28, 2014, the City Council adopted Ordinance

No. 1401,[2] which amended the Zoning Ordinance by, among other things, creating a new

category of use, "Assembly, religious institution, house of worship."  (Doc. No. 73

("Second Weigle Aff.") ¶ 5.).  That category, which was undefined, existed until the City

---

[2]     The record does not reflect whether or how the Zoning Ordinance regulated
churches and other religious uses prior to the adoption of Ordinance No. 1401.

Council amended the Zoning Ordinance on April 8, 2015.[3]  *See* Zoning Ordinance

§ 155.105.  Another undefined land use category, "Theaters (not outdoor drive-in),"

existed until the City Council amended the Zoning Ordinance on November 10, 2014.[4]

*See id.*  Although "Assembly, religious institution, house of worship" was a permitted use

in all four residential districts (R-1, R-2, R-3, and R-4) and a conditional use in the

public/institutional district (P/I), it was a prohibited use in B-1.  *Id.* §§ 155.007, 155.105.

"Theaters (not outdoor drive-in)," in contrast, was a permitted use in B-1.  *Id.* § 155.105;

*see also* Ordinance No. 1406 (establishing "Multi-Plex Theaters" as a conditional use in

B-1).

## II.     The Church's Attempts to Purchase the Theater Property

The Church is a Christian and Missionary Alliance church that holds worship

services at its building in Big Lake, Minnesota.  (Doc. No. 66 ("Machmer Aff.") ¶ 2.)

Between 2004 and 2014, average attendance at the Church's Sunday worship services

increased from 665 people to 1,481 people.  (*Id.* ¶ 3, Ex. A.)  To accommodate this

growth, Riverside began to consider adding a second location for worship.  (*Id.* ¶ 5.)

Starting in January 2014, the Church sought to purchase the Theater Property, a building

---

[3]     On April 8, 2015, the City Council adopted Ordinance No. 1502, which removed "Multi-Plex Theaters" and "Assembly, religious institution, house of worship" as land use categories and added "Assembly."  (Doc. No. 58 ("Weigle Aff.") ¶ 13, Ex. 9 ("Ordinance No. 1502").)

[4]     On November 10, 2014, the City Council adopted Ordinance No. 1406, which removed "Theaters (not outdoor drive-in)" as a land use category and added "Multi-Plex Theaters."  (Weigle Aff. ¶ 12, Ex. 8 ("Ordinance No. 1406").)

that formerly operated as a 15-screen movie theater.  (*Id.* ¶¶ 6-8; *see also* Doc. No. 57 ("Shepherd Aff.") ¶ 35, Ex. 34 ("Findings of Fact & Decision") ¶ 9.)  The Theater Property is located in the City's B-1 district.  (*See* Shepherd Aff. ¶ 21, Ex. 20 ("Planning Application") at 7.)  The Church claims that the City's Zoning Ordinance prevented it from purchasing the Theater Property on three occasions.

A.   **The Church's First Attempt to Purchase the Theater Property and City Staff's Representation that the Zoning Ordinance Prohibited Religious Worship at the Theater Property**

In January 2014, the Church learned that the Theater Property was for sale at a price that the Church could afford:  $2,950,000.  (Machmer Aff. ¶ 7.)  Shortly thereafter, one of the Church's pastors, Skipp Machmer, as well as its attorney, Craig Howse, contacted Marc Weigle, the City's Community Development Director, to ask about uses at the Theater Property under the Zoning Ordinance.  (*Id.* ¶ 8.)  Weigle informed Machmer and Howse that the Zoning Ordinance did not permit the Church to use the Theater Property for religious worship.  (Shepherd Aff. ¶ 6, Ex. 5 ("Machmer Dep.") at 31:11-25.)  During the same month, the Church made an offer to purchase the Theater Property, but the Church's prospective lender, the Alliance Development Fund ("ADF"), required the Church to obtain "[c]ity zoning approvals" before closing.  (Machmer Aff. ¶ 9, Ex. I at 1.)  Ultimately, the seller accepted an offer made by Cinemasota, Inc. ("Cinemasota"), a movie theater operator.  (*Id.* ¶ 10.)

In April 2014, Cinemasota offered to allow the Church to take over Cinemasota's purchase agreement with the seller for $1,750,000 plus closing costs.  (*Id.* ¶ 11.)  Church member Christian Bame offered to provide interim financing to the Church, so long as

the Church obtained City approval to use the Theater Property for worship.  (Doc. No. 68

("Hannon Aff.") ¶ 3.)  Church representatives met with Weigle and explained that the

Church sought to project a video simulcast of its services onto a screen in one of the

movie auditoriums at the Theater Property.  (Machmer Aff. ¶ 12.)  Weigle responded that

the Zoning Ordinance did not allow the Church's proposed use, because it fell within the

"Assembly, religious institution, house of worship" category, which was prohibited in

B-1.  (*Id.* ¶ 12; Weigle Aff. ¶ 2.)  In addition, Weigle suggested that the Church could

request an interpretation of the Zoning Code from the City Planning Commission.

(Weigle Aff. ¶ 2.)  Thereafter, the Church declined to take over the purchase agreement,

and on April 23, 2014, Cinemasota closed on its purchase of the Theater Property.  (*See*

Shepherd Aff. at ¶ 48, Ex. 47.)

> **B.  The Church's Second Attempt to Purchase the Theater Property and the City's Rejection of the Church's Request to Amend the Zoning Ordinance**

On July 17, 2014, the Church submitted a formal Planning Application to the City,

seeking an amendment to the text of the Zoning Ordinance.  (Machmer Aff. ¶ 13;

Planning Application.)  Specifically, the Planning Application requested that the Zoning

Ordinance be amended to add "Assembly, religious institution, house of worship" as a

permitted use in B-1.  (Planning Application at 3.)  It also included an addendum

explaining the purpose of the Application, stating in part:  "[The City's] denial of the use

of the [Theater] Property by Riverside, a religious institution, within the B-1 District is

inhibiting Riverside's ability to purchase and use the property."  (*Id.* at 7.)

At the same time, the Church engaged in negotiations with Cinemasota and ADF regarding the Church's continued desire to purchase the Theater Property.  On August 19, 2014, the Church and Cinemasota executed a Purchase and Sale Agreement ("Purchase Agreement"), which provided for the sale of the Theater Property from Cinemasota to the Church for a purchase price of $2,273,000.  (Shepherd Aff. ¶ 22, Ex. 21 ("Purchase Agreement").)  The Church's obligations under the Purchase Agreement were contingent upon City approval of the Church's intended use of the Theater Property.  (Purchase Agreement ¶ 5.)  Under the Purchase Agreement, if the City failed to grant approval by the closing date of December 1, 2014, the Purchase Agreement terminated, unless the Church waived the contingency.  (*Id.* ¶¶ 5-6.)  In addition, in a letter dated September 22, 2014, ADF approved a $3,210,000 loan to the Church, subject to certain requirements, including "[c]ity zoning approvals."  (Shepherd Aff. ¶ 25, Ex. 24 at 1.)  On November 20, 2014, the letter was amended to reflect ADF's approval of a $3,047,500 loan, subject to ADF's receipt of an agreement between the City and the Church "regarding the issuance of an occupancy permit."  (*Id.* ¶ 32, Ex. 31 at 2.)

While the Planning Application was pending, the City adopted two Ordinances affecting the Zoning Ordinance.  On November 10, 2014, the City Council adopted Ordinance No. 1405, which established a moratorium and study period.  (Wiegle Aff. ¶ 11, Ex. 7 ("Ordinance No. 1405").)  Under the Ordinance, the City would not "allow the use of any land for new or expanded assembly, theater, or church purposes during the period of this moratorium."  (Ordinance No. 1405 at § 3.)  According to the Ordinance,

the City implemented the moratorium, pursuant to Minn. Stat. § 462.355,[5] to give the City an opportunity to study the impacts of assemblies, theaters, and churches in business districts.  (*Id.* § 2.)  The Ordinance also acknowledged that the Church's Planning Application contributed to the City Council's decision to issue the moratorium.  (*Id.*)

On the same day, the City Council adopted Ordinance No. 1406, which amended the Zoning Ordinance by removing "Theaters (not outdoor drive-in)" as a land use category and adding "Multi-Plex Theaters" as a new category.  (Ordinance No. 1406.) The amended Zoning Ordinance defined "Multi-Plex Theater" as having, among other things, "[m]ultiple motion-picture shows with varied content . . . shown simultaneously in different theater rooms at staggered start times" seven days per week.  (*Id.* § 2.)  Under the amended Zoning Ordinance, "Multi-Plex Theaters" was a "conditional" use in the B-1 district.  (*Id.* § 3.)

In addition, during November 2014, the Church and the City attempted to negotiate an agreement that would allow the Church to use the Theater Property for religious assembly.  (Doc. No. 59 ("Lenhardt Aff.") ¶¶ 5-16.)  Among other things, the Church and the City discussed the number of people that would attend Church worship services and the effect of that number on traffic.  (Lenhardt Aff. ¶¶ 9, 11, Exs. B, D.) The City sought to impose a capacity-based limit of 1,200 seats, whereas the Church sought to impose an attendance-based limit of 1,200 actual people.  (*Id.*)  On

---

[5]     Under Minn. Stat. § 462.355, subd. 4, a municipality may adopt an interim ordinance that prohibits any use, for a period of up to one year, if the municipality is conducting studies for the purpose of considering amendment of a zoning ordinance.

November 22, 2014, the Church provided a draft agreement that established, in paragraph 1(a), an attendance-based limit:  "Riverside's single, regular worship service attendee limit shall not be less than 1,200 persons."  (*Id.* ¶ 11, Ex. E at ¶ 1(a).)

On November 24, 2014, the City responded with a modified version of the same agreement.  (*Id.* ¶ 12, Ex. H.)  The City's draft revised paragraph 1(a) but maintained the attendance-based limit of 1,200 people that the Church proposed.  (*Id.* ¶ 12, Ex. H at ¶ 1(a).)  It also amended the "default" provision in paragraph 6 by adding a waiver of rights by the Church:  "Riverside expressly, voluntarily and knowingly waives any claim that the entry of said injunction [to enforce the parties' agreement] or its enforcement violates RLUIPA, the Minnesota or United States Constitutions, or any statute or other legal principle."  (*Id.* ¶ 12, Ex. H at ¶ 6.)  The Church responded to the City's revisions in a letter dated November 25, 2014.  (Shepherd Aff. ¶ 34, Ex. 33.)  The letter stated, in relevant part:

> After a review of [the City's] changes, we are withdrawing from future negotiations on conditions on the use of the [Theater Property].  While there were acceptable changes, mostly grammatical in nature, the major changes are completely unacceptable.  There is a fundamental violation of Riverside's constitutional and statutory rights occurring and now the City has drafted documents which require Riverside, a church, in paragraph 6 of the Site Plan Agreement to relinquish its rights under the United States Constitution to the free exercise of religion and the other legal rights that come with those First Amendment protections.

(*Id.*)  The letter did not expressly address paragraph 1(a)'s limit on the number of people attending worship at the Theater Property.  (*See id.*)

On November 25, 2014, the City denied the Church's Planning Application, issuing a document entitled "Findings of Fact and Decision."  According to that

9

document, the City found that "[a]llowing Assemblies, Religious Institutions, and Places of Worship as a permitted use in all B-1 zoned properties would be inconsistent with the goals and policies of the City Comprehensive Plan and the purpose of the B-1, General Business District as found in . . . the Zoning Code." (Findings of Fact & Decision ¶ 3.) Among other things, the City cited concerns about the negative impact of a religious institution on neighboring commercial properties, as well as concerns about a religious institution's parking needs. (*Id.* ¶¶ 4-5, 19-21.) The City also focused on the effect of assemblies, religious institutions, and places of worship on traffic flow, noting that increased traffic might lead to decreased safety, overburdening of the City's roads, and diversion of law enforcement resources. (*Id.* ¶¶ 6-8.)

Moreover, the City concluded that "Assemblies, Religious Institutions, and Places of Worship are not similar to a 15 screen multiplex theater in terms of traffic generation, parking needs or impacts, retail synergy or commercial use." (*Id.* ¶ 13.) Significantly, the City found that while multiplex theaters have multiple screenings with different start times, the Church's proposed use would involve a single screening with a single start time, which would lead to high levels of traffic at the beginning and end of the screening. (*Id.* ¶¶ 12, 14-16.) Indeed, the City commissioned a study of the Church's proposed use of the Theater Property on traffic and concluded that if the City approved the Church's Planning Application, the Church "could operate a church at the [Theater] Property as a Permitted Use with no regulations in place to address the anticipated peak period traffic problems identified in the Traffic Study." (*Id.* ¶¶ 16-17.)

On December 2, 2014, one week after the City denied the Church's Planning
Application, the City posted a Statement Regarding Decision on Riverside Church
Zoning Application ("Statement") to the City website.  (Shepherd Aff. ¶ 37, Ex. 36
("Statement").)  The Statement explained the City's concerns about traffic safety at the
Theater Property and claimed, among other things, that the Church would not agree to
limit the number of worship service attendees:

> However, despite several ideas and attempts from the City to resolve the
> traffic safety issues identified by the City's traffic consultant, Riverside
> would not agree to an enforceable worship space limit.  On Tuesday,
> November 25, 2014 Riverside notified the City in writing that it was
> "withdrawing from future negotiations."  As a result, the City Council
> denied the zoning amendment request.

(Statement.)  After the City denied the Church's Planning Application, the Church
permitted the Purchase Agreement with Cinemasota to terminate.  (*See* Machmer Aff.
¶ 14; Purchase Agreement ¶ 5(f)-(g).)

### C.   The Church's Third Attempt to Purchase the Theater Property and the City's Amendment of the Zoning Ordinance

On March 20, 2015, the Church entered into a Real Estate Option Agreement
("Option Agreement") with Cinemasota.  (Machmer Aff. ¶ 15, Ex. H ("Option
Agreement").)  Under the Option Agreement, the Church paid $10 in exchange for the
right to buy the Theater Property for a purchase price of $3,558,375, plus Cinemasota's
expenditures, including improvements and repairs to the Theater Property.  (Option
Agreement ¶ 6.)  The Option Agreement provided that the Church's option to purchase
the Theater Property would expire on April 24, 2015.  (*Id.* ¶ 2.)  Three days after entering

into the Option Agreement, the Church filed this lawsuit against the City.  (Doc. No. 1

("Compl.").)

On April 8, 2015, while this litigation was pending, the City Council adopted

Ordinance No. 1502.  (Ordinance No. 1502.)  Ordinance No. 1502 removed "Multi-Plex

Theaters" and "Assembly, religious institution, house of worship" as land use categories

and added "Assembly" as a new category.  (*Id.*)  It defined "Assembly" as follows:  "[A]

group of persons gathered together for a particular purpose whether religious, political,

educational, social or cultural.  Types of assemblies include movie theaters, concert halls,

places of worship, funeral homes, day care facilities, conference centers and the like."

(*Id.* § 2.)  Under the amended Zoning Ordinance, "Assembly" uses were conditional uses

in the B-1 district, and approval for an "Assembly" use in the B-1 district required

satisfaction of specific requirements related to traffic and parking.  (*Id.* §§ 3-4.)  On

April 14, 2015, the City Council adopted Ordinance No. 1503, which exempted

applications for conditional use permits pursuant to Ordinance No. 1502 from the

moratorium imposed by Ordinance No. 1405.  (Weigle Aff. ¶ 13, Ex. 10 ("Ordinance

No. 1503").)

On April 21, 2015, the City issued a conditional use permit to the Church that

allowed the Church to use the Theater Property for "Assembly" purposes.  (Shepherd

Aff. ¶ 43, Ex. 42.)  On April 24, 2015, Cinemasota advised the Church that the purchase

price of the Theater Property, including Cinemasota's expenditures on improvements and

repairs, would be at least $5,031,054.95.  (Machmer Aff. ¶ 17)  The Church determined

that it could not purchase the Theater Property at that price.  (*Id.*)  It did not purchase the

Theater Property, and it has not located an alternative property that meets its needs at a price it can afford.  (*Id.* ¶¶ 17-18)

After the Church decided not to exercise its option to purchase the Theater Property, the City finished the Study of Assemblies, Theaters & Churches ("Study"), as contemplated by Ordinance No. 1405.  (Weigle Aff. ¶ 17, Ex. 12 ("Study"); *see also* Ordinance No. 1405.)  Thereafter, the City Council adopted Ordinance No. 1506, which incorporated recommendations from the Study.  (Weigle Aff. ¶ 18, Ex. 13 ("Ordinance No. 1506").)  In particular, Ordinance No. 1506 repealed Ordinance Nos. 1405 and 1503 but continued to allow certain assembly uses, including places of worship, in the B-1 zoning district.  (Ordinance No. 1506.)

## III.    This Lawsuit

As noted above, on March 23, 2015, the Church filed this lawsuit against the City. (Compl.)  The Amended Complaint, filed May 19, 2015, asserts five counts based on the Zoning Ordinance's prohibition on religious assemblies in B-1 prior to April 8, 2015: (1) violation of the First Amendment right of free speech and assembly; (2) violation of the First Amendment right of free religious exercise; (3) violation of the Minnesota Constitution's right of conscience[6]; (4) violation of RLUIPA's substantial burden provision, 42 U.S.C. § 2000cc(a)(1); and (5) violation of RLUIPA's equal terms provision, 42 U.S.C. § 2000cc(b)(1).  (Doc. No. 38 ("Am. Compl.") ¶¶ 115-56.)  In

---

[6]     At oral argument, the Church advised the Court that it is no longer pursuing Count 3, its claim under the Minnesota Constitution.  Accordingly, the Court grants summary judgment in favor of the City on Count 3.

addition, Count 6 claims that the Statement on the City's website was defamatory and libelous.[7]  (*Id.* ¶¶ 157-160.)

The Amended Complaint seeks declaratory relief, damages, reasonable attorney's fees, and costs.[8]  (*Id.* ¶¶ A-F.)  The Church brings its First Amendment claims under 42 U.S.C. § 1983, under which a plaintiff may obtain compensatory damages against a municipality that has deprived the plaintiff of its constitutional rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Carey v. Piphus*, 435 U.S. 247, 255-57 (1978).[9]  In addition, 42 U.S.C. § 1988 provides attorney fees to the "prevailing party" in an action under § 1983 or RLUIPA.

In this context, the Court considers the City's motion for summary judgment on all counts (Doc. No. 54) and the Church's motion for partial summary judgment on Counts 1 and 5 (Doc. No. 62).

---

[7]    The Church has abandoned its claim that a City staff person's statement in an e-mail constituted libel and defamation.  (Doc. No. 74 at 37 n.9.)  As such, the Court considers only the website Statement.

[8]    The Church has abandoned its claim for injunctive relief.  (Doc. No. 64 at 29.)

[9]    The Church also seeks compensatory damages under RLUIPA, which provides that a plaintiff may "obtain appropriate relief against a government."  42 U.S.C. § 2000cc-2(a).  Interpreting this provision, multiple courts have determined that a city may be liable for monetary damages under RLUIPA.  *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 290 (5th Cir. 2012); *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168-69 (9th Cir. 2011).  The Eighth Circuit, however, has not considered the issue.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

### II.    Justiciability

To begin, the Court considers three threshold justiciability matters raised by the City:  standing, ripeness, and mootness.  According to the City, standing, ripeness, and mootness each provide an independent basis for dismissing the Church's claims under the First Amendment (Counts 1 and 2) and RLUIPA (Counts 4 and 5).

A.      **Standing**

The doctrine of standing stems from Article III of the Constitution, which limits federal court jurisdiction to "cases" and "controversies." U.S. Const. art. III; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  A case or controversy exists only if the three elements of standing are met:  (1) the plaintiff suffered an injury that is both "concrete and particularized" and "actual or imminent"; (2) such injury is "fairly traceable" to the challenged action of the defendant; and (3) it is "likely" that such injury will be "redressed by a favorable decision" from the court. *Lujan*, 504 U.S. at 560-61 (internal quotation marks, brackets, and ellipses omitted).  The City disputes the first two elements, injury and causation.

First, the City argues that the Church cannot establish that it suffered an injury, because it never purchased the Theater Property.  The Court disagrees.  Setting aside the question of whether or when the Church had an ownership interest in the Theater Property, no ownership interest is necessary to confer Article III standing. *See Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir. 2014); *Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Charter Twp.*, Civ. No. 12-10803, 2015 WL 5131797, at *2 (E.D. Mich. June 1, 2015).  Instead, "[t]o establish injury in fact, a plaintiff must show that [it] suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (as revised) (internal quotation marks omitted).  Here, the Church alleges that the City unlawfully prevented the Church from purchasing the Theater Property and using it for

16

religious worship.  The Church's alleged inability to buy and use the Theater Property

constitutes a concrete, particularized, and actual injury under Article III.  *See Primera*

*Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1304 (11th

Cir. 2006) (explaining that zoning restriction on property use may constitute injury

sufficient to establish standing).

Second, the City contends that even if the Church suffered an injury, the injury

was not caused by the City or its Zoning Ordinance.  Again, the Court disagrees.

Although the Church's injury may have been the result of multiple causes—including

causes unrelated to the City or the Zoning Ordinance—standing doctrine does not require

sole or direct causation.  *See Lujan*, 504 U.S. at 560.  Indeed, the Supreme Court has

found standing even while acknowledging an "attenuated line of causation to the eventual

injury."  *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,

412 U.S. 669, 688 (1973).  Here, the Church wanted to purchase the Theater Property for

religious assembly, which was a prohibited use under the Zoning Ordinance.  Although

neither the City nor its Zoning Ordinance literally barred the Church from purchasing the

Theater Property, it would have made little sense for the Church to purchase the Theater

Property when the Zoning Ordinance prohibited the Church from using it for religious

assembly.  Moreover, the City's denial of the Church's Planning Application effectively

determined that the Church could not use the Theater Property for religious worship.

Thus, the Church's injury is "fairly traceable" to the City and the Zoning Ordinance.  *See*

*Lujan*, 504 U.S. at 560; *Primera Iglesia*, 450 F.3d at 1304 (finding causation sufficient

for standing where application of zoning ordinance to plaintiff "directly and expressly" limited plaintiff's use of property).

Having rejected the City's injury and causation arguments, the Court concludes that the Church has established standing sufficient to bring its First Amendment and RLUIPA claims against the City.

### B.     Ripeness

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority."  *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  It "dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities," and it "becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all."  *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir. 1989).  In land use disputes—including those involving First Amendment and RLUIPA claims—ripeness requires a plaintiff to "obtain a final, definitive position as to how it could use the property from the entity charged with implementing the zoning regulations."  *Murphy*, 402 F.3d at 348 (citing *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985)); *see also Miles Cristi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537-38 (6th Cir. 2010); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224-25 (11th Cir. 2004).  One reason for this finality requirement is that only with a final decision from a municipality "will a court know precisely how a regulation will be applied to a particular parcel."  *Murphy*, 402 F.3d at 348.

18

The Court finds that, for the purposes of ripeness, the Church "obtain[ed] a final, definitive position" from the City as to how the Church could use the Theater Property when the City issued its Findings of Fact and Decision regarding the Church's Planning Application. *See Murphy*, 402 F.3d at 348.  The Planning Application, including its addendum, expressly stated the Church's purpose for requesting an amendment to the Zoning Ordinance—namely, the Church's desire to use the Theater Property for simulcasting its worship services.  In denying the Planning Application, the Findings of Fact and Decision addressed concerns unique to the Church and the Theater Property and referenced a traffic study specifically analyzing the Church's proposed use.  Further, the Findings of Fact and Decision made clear that the City did not consider the Church's proposed use of the Theater Property to be equivalent to use as a movie theater or multi-plex cinema.  Accordingly, because the City issued a final, definitive position, the Church's First Amendment and RLUIPA claims are ripe for adjudication.

### C.    Mootness

Under the doctrine of mootness, the essential question is:  "whether the plaintiffs still hold a personal interest in the outcome of the action or whether changed circumstances already provide the requested relief and eliminate the need for court action." *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004).  A claim for damages avoids mootness, while "a request for injunctive relief remains live only so long as there is some present harm left to enjoin." *De la O v. Housing Auth. of El Paso*, 417 F.3d 495, 499 (5th Cir. 2005); *see also Advantage Media, L.L.C. v. City of Hopkins*, 408 F. Supp. 2d 780, 794-95 (D. Minn. 2006).  Indeed, in land use disputes, a plaintiff no

longer affected by a land use regulation is not entitled to injunctive or declaratory relief related to such regulation. *Centro Familiar*, 651 F.3d at 1167-68; *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260-61 (3d Cir. 2007).

Here, the City claims that amendments to the Zoning Ordinance moot the Church's First Amendment and RLUIPA claims. Specifically, in April 2015, the City Council amended the Zoning Ordinance to allow "Assembly" uses—including religious assembly uses—as conditional uses in the B-1 district, and the City issued a conditional use permit to the Church for its proposed use of the Theater Property. Because the Zoning Ordinance's former prohibition on religious assembly uses in the B-1 district no longer affects the Church, the Church's claims for injunctive and declaratory relief are moot. However, the Church's claims for damages and attorney fees still present a live controversy. As such, the Court will allow the Church's claims related to the Zoning Ordinance to move forward insofar as they are claims for compensatory damages and attorney fees. *See, e.g.*, *Centro Familiar*, 651 F.3d at 1167-68; *Lighthouse*, 510 F.3d at 260-61.

## III.   RLUIPA

Having determined that the Church's claims for compensatory damages and attorney fees present a justiciable dispute, the Court turns to the Church's claims under RLUIPA. The Church claims that the City violated two provisions of RLUIPA, the

"substantial burden" provision and the "equal terms" provision.  The former provision

limits land use regulations[10] that substantially burden religious exercise:

> No government shall impose or implement a land use regulation in a
> manner that imposes a substantial burden on the religious exercise of a
> person, including a religious assembly or institution, unless the government
> demonstrates that imposition of the burden on that person, assembly, or
> institution—
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling
> > governmental interest.

42 U.S.C. § 2000cc(a)(1).  The latter provision demands that land use regulations treat

religious institutions on equal terms with secular institutions:

> No government shall impose or implement a land use regulation in a
> manner that treats a religious assembly or institution on less than equal
> terms with a nonreligious assembly or institution.

---

[10]     In the context of RLUIPA, "land use regulation" is a term of art defined as
follows:

> [A] zoning or landmarking law, or the application of such a law, that limits
> or restricts a claimant's use or development of land (including a structure
> affixed to land), if the claimant has an ownership, leasehold, easement,
> servitude, or other property interest in the regulated land or a contract or
> option to acquire such an interest.

42 U.S.C. § 2000cc-5(5).  Under that definition, to state a RLUIPA claim, a plaintiff must
have a property interest in the land at issue.  *See, e.g., Taylor v. City of Gary*,
233 F. App'x 561, 562 (7th Cir. 2007).  In this case, the Court notes that the Church was
party to two contracts related to the Theater Property:  (1) the Purchase Agreement, from
August 19, 2014 through December 1, 2014; and (2) the Option Agreement, from
March 20, 2015 through April 24, 2015.  Given these facts, the Court assumes, but does
not decide, that the Church had a property interest sufficient to satisfy RLUIPA's
property interest requirement.

42 U.S.C. § 2000cc(b)(1).  The City seeks summary judgment under both provisions, while the Church seeks summary judgment on its equal terms claim only.

### A.     The Safe Harbor Provision

Before considering whether the City violated either the substantial burden provision or the equal terms provision, the Court considers RLUIPA's so-called "safe harbor" provision, which allows a government to avoid RLUIPA's "preemptive force" by changing its policies and practices:

> A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C. § 2000cc-3(e).

The Eighth Circuit has not had occasion to construe this provision, so the Court turns to the Seventh Circuit's interpretation in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003).  *Civil Liberties* stands for the proposition that, under RLUIPA's safe harbor provision, a government can avoid liability under RLUIPA by amending its land use regulations to remove the allegedly burdensome or discriminatory provisions, even after such provisions have caused harm.  *Civil Liberties*, 342 F.3d at 762.  In that case, the plaintiff churches claimed that they had incurred various expenses due to the defendant city's zoning ordinance, which placed certain restrictions on churches.  *Civil Liberties*, 342 F.3d at 755-58.  After years of litigation, the city amended the zoning ordinance such that it placed churches on equal footing with

secular assembly uses.  *Id.* at 758-762.  Considering the safe harbor provision, the Seventh Circuit explained that although the provision specifically references elimination of "substantial burdens," it can operate to relieve liability under either the substantial burden or nondiscrimination provisions of RLUIPA.  *Civil Liberties*, 342 F.3d at 762.  As such, the court concluded that the city's amendments to the zoning ordinance barred the plaintiffs' RLUIPA nondiscrimination claim.[11]  *Id.*

Since the Seventh Circuit's decision in *Civil Liberties*, courts in two Districts have relied on that case in finding a government not liable under RLUIPA.  *Grace Church of Roaring Fork Valley v. Bd. of Cty. Comm'rs*, 742 F. Supp. 2d 1156, 1160 (D. Colo. 2010) (granting summary judgment to defendant under RLUIPA's safe harbor provision where city permitted construction and use of plaintiff church's facilities, thereby eliminating burden imposed by city's denial of plaintiff's special use application); *Petra Presbyterian Church v. Village of Northbrook*, 409 F. Supp. 2d 1001, 1008 (N.D. Ill. 2006), *aff'd*, 489 F.3d 846 (7th Cir. 2007) (granting summary judgment to defendant under RLUIPA's safe harbor provision where city amended allegedly discriminatory zoning ordinance); *Boles v. Neet*, 402 F. Supp. 2d 1237, 1241 (D. Colo. 2005) (granting summary judgment to defendant under RLUIPA's safe harbor provision where corrections department changed practices that allegedly infringed plaintiff prisoner's religious practice rights).  *But see Family Life Church v. City of Elgin*, Civ. No. 07-217, 2007 WL 2790763, at *5 (N.D. Ill.

---

[11]   In *Civil Liberties*, the plaintiffs' RLUIPA nondiscrimination claims included claims under RLUIPA's equal terms provision, 42 U.S.C. § 2000cc(b)(1).  *Civil Liberties*, 342 F.3d at 760.

2007) (denying defendant's motion to dismiss and stating, "we do not read . . . RLUIPA

or *Civil Liberties* to stand for the proposition that . . . corrective action can retroactively

erase injuries already incurred . . .").

Here, the Church claims that the City's Zoning Ordinance, prior to its April 8,

2015 amendment, violated RLUIPA.  In particular, the Zoning Ordinance prohibited

"Assembly, religious institution, house of worship" uses in the B-1 district, while

allowing "Theaters (not outdoor drive-in)" and later "Multi-Plex Theaters."  As such, the

Church argues that the Zoning Ordinance, and the City's denial of the Church's Planning

Application:  (1) imposed a substantial burden on the Church's exercise of religion by

preventing the Church from purchasing the Theater Property; and (2) treated the Church

on unequal terms by permitting movie theater uses but not religious assembly or church

uses at the Theater Property.  (Doc. No. 64 at 25; Doc. No. 74 at 31.)

On April 8, 2015, however, the City amended the Zoning Ordinance to allow

"Assembly" uses—including movie theaters and places of worship—as conditional uses

in the B-1 district, and on April 21, 2015, the City issued a conditional use permit to the

Church that allowed the Church to use the Theater Property for "Assembly" purposes.

The April 8, 2015 amendment and the April 21, 2015 issuance of the conditional use

permit to the Church, taken together, permitted the Church to purchase the Theater

Property for use as a place of worship and placed the Church on equal footing with

secular assemblies, including movie theaters.  Accordingly, the amendment and the

conditional use permit eliminated any alleged substantial burden and any alleged

discriminatory treatment imposed by the former Zoning Ordinance or by the City's denial

24

of the Church's Planning Application.  Thus, RLUIPA's safe harbor provision applies, and the Church's RLUIPA claims are barred.  The Court grants summary judgment to the City on Counts 4 and 5 of the Amended Complaint.

### B.  The Substantial Burden Provision

Even if the safe harbor provision did not apply, the Church's RLUIPA claims would fail.  To begin, the Court considers the Church's substantial burden claim.

### 1.  Applicability of the Substantial Burden Provision

RLUIPA's substantial burden provision only applies if one of three jurisdictional tests is met.  42 U.S.C. § 2000cc(a)(2); *Midrash*, 366 F.3d at 1225.  Under the "individualized assessment" test, the substantial burden provision applies when the alleged substantial burden "is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, *individualized assessments* of the proposed uses for the property involved."  42 U.S.C. § 2000cc(a)(2)(C) (emphasis added).  In other words, RLUIPA applies when "the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use."  *Guru Nanak Sikh Soc. of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 986 (9th Cir. 2006).

Here, jurisdiction is appropriate under the individualized assessment test. Although the Church's Planning Application requested a generally applicable amendment to the Zoning Ordinance, the City's Findings of Fact and Decision demonstrates that the City considered the Church's particular proposed use of the Theater Property, including

the impact of that use on traffic and public safety.  As such, the City made an individualized assessment of the Church's proposed use of the Theater Property, and the substantial burden provision applies.

### 2.      Substantial Burden on Religious Exercise

Under RLUIPA's substantial burden provision, land use regulations that impose a substantial burden on religious exercise are subject to strict scrutiny.  42 U.S.C. § 2000cc(a)(1).  "Religious exercise" includes "[t]he use, building, or conversion of real property for the purpose of religious exercise."  42 U.S.C. § 2000cc-5(7)(B).  Thus, the Court begins by considering whether the Zoning Ordinance imposed a substantial burden on the Church's use of the Theater Property to exercise its religion.  *See Midrash*, 366 F.3d at 1226.

Neither the Supreme Court nor the Eighth Circuit has defined "substantial burden" in the context of RLUIPA.[12]  Multiple circuit courts, however, have considered the question, and while these courts do not entirely agree, the following is a standard that emerges:  a substantial burden exists if a government action pressures a religious institution to change its behavior.  *E.g., Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 556 (4th Cir. 2013) ("[A] plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial

---

[12]      RLUIPA's legislative history indicates that "[t]he term 'substantial burden' . . . is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden . . . ."  146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy); *see also, e.g., Guru Nanak*, 456 F.3d at 988 ("The Supreme Court's free exercise jurisprudence is instructive in defining a substantial burden under RLUIPA.").

pressure on it to modify its behavior."); *Int'l Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011) (as amended) ("[A] substantial burden on religious exercise must impose a significantly great restriction or onus upon such exercise." (internal quotation marks omitted)); *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (explaining a substantial burden as "government action that directly *coerces* the religious institution to change its behavior"); *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 737 (6th Cir. 2007) ("[W]e find the following consideration helpful:  though the government action may make religious exercise more expensive or difficult, does the government action place substantial pressure on a religious institution to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of its religion?"); *Vision Church, United Methodist v. Village of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006) ("[A] land use regulation imposes a substantial burden on religious exercise if it necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." (internal quotation marks omitted)); *Midrash*, 366 F.3d at 1227 ("[A] substantial burden must place more than an inconvenience on religious exercise; [it] is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." (internal quotation marks omitted)); *see also Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 94-97 (1st Cir. 2013) (discussing substantial burden standards and using a multi-factor "functional approach").

In addition, when evaluating substantial burden claims, courts have found that a land use regulation imposes a substantial burden when the government enforcing the land use regulation acts unreasonably.  The Ninth Circuit, for example, found a substantial burden where:  (1) the county twice denied the plaintiff's conditional use permit applications based on "broad reasons [that] could easily apply to all future applications"; and (2) the plaintiff "readily agreed to every mitigation measure suggested," but the county, "without explanation, found such cooperation insufficient."  *Guru Nanak*, 456 F.3d at 989.  Likewise, the Second Circuit found a substantial burden where the zoning decision at issue "was characterized . . . by an arbitrary blindness to the facts." *Westchester*, 504 F.3d at 352; *see also Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 898-901 (7th Cir. 2005) (finding a substantial burden where the city's legal errors suggested bad faith and where alternative courses of action would have caused "delay, uncertainty, and expense" for the plaintiff).

In the absence of such unreasonable conduct, however, courts have been reluctant to find a substantial burden, emphasizing that a church's inability to obtain a building with the size and location that the church desires is not enough to state a claim.  The Fourth Circuit, for example, found no substantial burden where the plaintiffs "never had a reasonable expectation that [a particular] property could be used as a church," adding that "[t]he absence of affordable and available properties within a geographic area will not by itself support a substantial burden claim."  *Andon, LLC v. City of Newport News*, 813 F.3d 510, 515-16 (4th Cir. 2016).  Similarly, the Seventh Circuit stated:  "When there is plenty of land on which religious organizations can build churches (or, as is common

28

nowadays, convert to churches buildings previously intended for some other use) in a community, the fact that they are not permitted to build everywhere does not create a substantial burden." *Petra*, 489 F.3d at 851; *see also Civil Liberties*, 342 F.3d at 761 (finding that scarcity of affordable land, along with costs, procedure, and politics of zoning approval process, did not impose a substantial burden); *Living Water*, 258 F. App'x at 741 (finding no substantial burden where plaintiff failed to show that it could not carry out its ministries without the requested permit, instead demonstrating "only that it cannot operate its church on the *scale* it desires").

Here, the Court determines that neither the Zoning Ordinance nor the City's denial of the Church's Planning Application constitutes a substantial burden under RLUIPA. Although the Zoning Ordinance and denial certainly inconvenienced the Church, the Court cannot conclude that they rose to the level of imposing a substantial burden. Indeed, while the Zoning Ordinance and denial prevented the Church from establishing a second site in the B-1 district, the Church could have established a site in one of four residential districts, or, with a conditional use permit, in the public/institutional district. That the Church could not take advantage of "bargain-basement prices" does not entitle the Church to relief. (*See* Doc. No. 80 at 13.) In addition, the City issued a detailed Findings of Fact and Decision explaining its denial of the Church's Planning Application, thereby suggesting that the City did not act arbitrarily or unreasonably in reaching its decision. Accordingly, even without the safe harbor provision, the Court would grant summary judgment in favor of the City on Count 4.

C.      **The Equal Terms Provision**

Next, the Court considers the Church's equal terms claim.  RLUIPA's equal terms

provision prohibits land use regulations that treat religious assemblies and nonreligious

assemblies on "less than equal terms."  42 U.S.C. § 2000cc(b)(1).  As such, the Court

evaluates the Church's claim that the Zoning Ordinance placed churches on less than

equal footing in comparison to movie theaters.

Again, neither the Supreme Court nor the Eighth Circuit has had occasion to

establish a test for applying the equal terms provision.  Several circuit courts have

developed tests, but they are in conflict with one another.  *See Chabad Lubavitch*, 768

F.3d at 196 (acknowledging conflict among circuits).  Under the Eleventh Circuit's literal

reading of the equal terms provision, all uses that fall under the umbrella of "assembly or

institution" are similarly situated to churches and may not be treated differently than

churches.  *Midrash*, 366 F.3d at 1230-31.  In contrast, under the Third Circuit's rule, "a

regulation will violate the Equal Terms provision only if it treats religious assemblies or

institutions less well than secular assemblies or institutions that are similarly situated *as

to the regulatory purpose*."  *Lighthouse*, 510 F.3d at 266.[13]  The Seventh Circuit's rule is

similar to the Third Circuit's rule but considers secular assemblies or institutions that are

similarly situated as to "accepted zoning *criteria*."  *River of Life Kingdom Ministries v.

Village of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010) (en banc).  That is, both the

---

[13]      The Ninth Circuit's test is "about the same as the Third Circuit's [and] look[s] to
see if the church is 'similarly situated as to the regulatory purpose.'"  *Centro Familiar*,
651 F.3d at 1172 (quoting *Lighthouse*, 510 F.3d at 266).

Third and Seventh Circuits look to uses "similarly situated" to churches, but the Third

Circuit focuses on regulatory purpose and the Seventh Circuit focuses on zoning

criteria.[14]

Considering these approaches, and lacking binding precedent, the Court is

persuaded that the Eleventh Circuit's interpretation of the equal terms provision is

incorrect. To begin, mandating identical treatment of all secular assemblies and churches

could lead to nonsensical results. As noted in *River of Life*, secular assembly uses are

multiple and diverse, and many would affect a municipality and its residents differently

than a church would. *Id.* at 370 (noting that "assembly" could include a factory,

nightclub, zoo, park, or mall). Further, the Eleventh Circuit's rule misapprehends the

definition of "equal." As stated in *River of Life*, "'equality' . . . signifies not equivalence

or identity but proper relation to relevant concerns." *Id.* at 371; *see also Centro Familiar*,

651 F.3d at 1172 ("Equality is always with respect to a characteristic that may or may not

---

[14]     The Fifth Circuit's approach is similar to those of the Third and Seventh Circuits.
In the Fifth Circuit, "[t]he 'less than equal terms' must be measured by the ordinance
itself and the criteria by which it treats institutions differently." *Opulent Life*, 697 F.3d at
292 (quoting *Elijah Grp., Inc. v. City of Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011)).
The Fifth Circuit determines:

> (1) the regulatory purpose or zoning criterion behind the regulation at issue,
> as stated explicitly in the text of the ordinance or regulation; and
> (2) whether the religious assembly or institution is treated as well as every
> other nonreligious assembly or institution that is "similarly situated" with
> respect to the stated purpose or criterion.

*Id.*

31

be material."). Thus, the fact that two land uses are both assembly uses "doesn't make them 'equal' within the meaning of the statute." *River of Life*, 611 F.3d at 371.

In the Court's view, the approaches established by the Third and Seventh Circuits are more likely to reflect Congress' intent in enacting the equal terms provision.[15]   As such, the Court considers the regulatory purpose of the Zoning Ordinance as well as the zoning criteria relevant to B-1, a business district.  The regulatory purposes of the Zoning Ordinance included providing land for business and retail uses and strengthening the City's economy.  Zoning Ordinance § 155.205.  Relatedly, zoning criteria for a business district like B-1 include generation of taxable revenue and shopping opportunities.  *See River of Life*, 611 F.3d at 373.  With respect to these purposes and zoning criteria, a church is not similarly situated to a movie theater.[16]   A church is not in the business of selling items to the public and, as a non-profit entity, does not generate taxable revenue. A movie theater, in contrast, typically focuses on selling tickets and food to moviegoers and is a for-profit entity that generates taxable revenue.

Another regulatory purpose, reflected in the Findings of Fact and Decision denying the Church's Planning Application, is safety, especially as it relates to traffic

---

[15]   Because these tests, and the similar tests established by the Fifth and Ninth Circuits, lead to the same result, the Court does not decide which of the tests provides the correct legal standard.

[16]   Rather, a church might be similarly situated to a library or community center, which, like a church, would not have sales as its primary focus and would not generate taxable revenue.  *See River of Life*, 611 F.3d at 373.  The Court notes that the Zoning Ordinance prohibited libraries from B-1 and that a community center—like a church— would likely have fallen into the "Assembly, religious institution, house of worship" category banned in B-1.  *See* Zoning Ordinance § 155.105.

generated by a church.  (Findings of Fact & Decision ¶¶ 6-8.)  Regarding traffic safety, a church is not similarly situated to a movie theater.  Churches typically have one service, or perhaps two or three services back to back, which would lead to high levels of traffic at the beginning and end of each service.  (*See id.* ¶¶ 12, 14-16.)  Movie theaters, on the other hand, generally have multiple screenings with staggered start times, resulting in a more even traffic flow.  (*See id.*)

In sum, the Court finds that the City's prohibition on churches in B-1, while permitting movie theaters, does not violate RUIPA's equal terms provision, because churches are not similarly situated to movie theaters as to regulatory purpose or zoning criteria.  As such, even if the safe harbor provision did not bar the Church's RLUIPA claims, the Court would grant summary judgment in favor of the City on Count 5.

## IV.  First Amendment

The Court next turns to the Church's claims under the First Amendment, which states:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The First Amendment is applicable to the states, including municipal governments vested with state authority, through the Fourteenth Amendment.  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).  The Church asserts that the City's Zoning Ordinance violated its First Amendment rights to free speech and assembly as well as its right to free exercise of religion.  The City seeks

summary judgment on both claims, while the Church seeks summary judgment on the speech and assembly claim only.

## A.    Speech and Assembly

To begin, the Church claims that the City's Zoning Ordinance—prior to its amendment in April 2015—violated the Church's right to free speech and assembly to the extent that it unjustifiably differentiated between religious assembly uses and secular assembly uses.  (Doc. No. 64 at 17-18.)  "The First Amendment generally prevents government from proscribing speech or even expressive conduct because of disapproval of the ideas expressed," including religious ideas.  *See Peterson v. City of Florence*, 727 F.3d 839, 842 (8th Cir. 2013) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).  Courts have repeatedly analyzed land use regulations as government restrictions on speech and assembly.  *E.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986); *Peterson*, 727 F.3d at 842; *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 468 (8th Cir. 1991); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 980-81 (N.D. Ill. 2003).

To determine whether a land use regulation is an unconstitutional restriction on speech and assembly, the Court must begin by determining whether the regulation is content-based or content-neutral.  *Peterson*, 727 F.3d at 842.  Content-based regulations are subject to strict scrutiny:  they "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed*, 135 S. Ct. at 2226.  Content-neutral regulations, in contrast, are considered "time, place, and manner" restrictions that are subject to

34

intermediate scrutiny:  they must "(1) be narrowly tailored to serve a significant

governmental interest, and (2) leave open ample alternative channels for communication

of the information." *Cornerstone*, 948 F.2d at 469.

### 1.        Content-based or Content-neutral

First, the Court considers whether the Zoning Ordinance is content-based or

content-neutral.  "A content-based regulation restricts speech because of its expressive

content," whereas "[a] content-neutral regulation is 'justified without reference to the

content of the regulated speech.'"  *Peterson*, 727 F.3d at 842 (quoting *Renton*, 475 U.S.

at 48).  Indeed, as the Supreme Court has explained, "[a] regulation that serves purposes

unrelated to the content of expression is deemed neutral, even if it has an incidental effect

on some speakers or messages but not others."  *Ward v. Rock Against Racism*, 491 U.S.

781, 791 (1989).

While the question of content-based versus content-neutral is difficult, the Eighth

Circuit's decision in *Cornerstone* provides binding authority and involves circumstances

similar to those present in this case.  Specifically, *Cornerstone* stands for the proposition

that an ordinance that restricts churches to certain zoning districts is content-neutral if it

has a content-neutral justification.  *Cornerstone*, 948 F.2d at 468.  In that case, a church

challenged the constitutionality of a city's zoning ordinance, which allowed churches in

residential districts but prohibited them in the central business district.  *Id.*  The city

claimed that the purpose of the prohibition was not to circumscribe religious worship but

to limit negative "secondary effects" of churches on the central business district's

economic vitality.  *Id.*  Because the city's justification for the ordinance was

content-neutral, the court found the ordinance was content-neutral. *Id.*; *see also*

*Vineyard*, 250 F. Supp. 2d at 981-83 (concluding that ban on religious institutions in

certain zoning districts was content-neutral because ban was not intended to target

religious messages).

In reaching its conclusion in *Cornerstone*, the Eighth Circuit relied on the

Supreme Court's decision in *Renton*, another land use case that found that an ordinance

was content-neutral because it sought to regulate "secondary effects" of speech.

*Cornerstone*, 948 F.2d at 468 (citing *Renton*, 475 U.S. at 46-48). In *Renton*, a business

challenged a city's ordinance specifically prohibiting "adult motion picture theaters"

within 1,000 feet of certain other uses. *Renton*, 475 U.S. at 44. The ordinance, by its

own terms, sought to prevent crime and protect economic stability, not to suppress

expression. *Id.* at 48. As such, the Supreme Court found that the ordinance was not

aimed at the content of speech but rather at the "secondary effects" of speech on the

surrounding community. *Id.* at 47. Accordingly, the ordinance was content-neutral and

subject to intermediate scrutiny. *Id.* at 48-49.

Here, in light of *Cornerstone* and *Renton*, the Court finds that the City's Zoning

Ordinance served to regulate "secondary effects" of religious land use. The Zoning

Ordinance's stated purpose included "public health and safety" and the "general welfare

of the inhabitants of the city." Zoning Ordinance § 155.002. The stated purpose of the

B-1 district—where "Assembly, religious institution, house of worship" uses were

prohibited—included providing lands for business, office, and retail uses; strengthening

the City's economic base; and providing employment opportunities. *Id.* § 155.205.

Further, the Findings of Fact and Decision denying the City's Planning Application stressed both the potential negative impact of religious uses on neighboring commercial properties and the possible negative effects of assembly uses (including churches) on public safety, particularly as it relates to traffic generated by an assembly with a single start time.  None of these justifications for the Zoning Ordinance's prohibition on "Assembly, religious institution, house of worship" uses in B-1 was based on the content of religious speech.  Rather, as in *Cornerstone* and *Renton*, the City sought to regulate the "secondary effects" of "Assembly, religious institution, house of worship" uses in B-1. Accordingly, the Zoning Ordinance is content-neutral and subject to intermediate scrutiny.

### 2.        Application of Intermediate Scrutiny

Although the Zoning Ordinance is a content-neutral restriction on speech, it remains subject to intermediate scrutiny and must therefore be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information."  *Cornerstone*, 948 F.2d at 469.

### i.        Interest and Tailoring

To begin, the Court examines whether the City's Zoning Ordinance furthered a "significant governmental interest."  *See id.*  In *Cornerstone*, the Eighth Circuit recognized that a city's goals of preserving and restoring a central business district were "unquestionably a permissible municipal objective."  *Id.*  Similarly, in *Renton*, the Supreme Court found that prevention of crime and protection of retail trade and property values were "vital governmental interests."  *Renton*, 475 U.S. at 50.  Here, as noted

above, the City asserts interests in protecting the community's economic wellbeing and safety—particularly, safety related to traffic control. The Court concludes that these are significant governmental interests.

Next, the Court considers whether the Zoning Ordinance was "narrowly tailored" to serve the City's economic and safety interests. *See Cornerstone*, 948 F.2d at 469. To satisfy the narrow-tailoring requirement, a regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. In addition, in a case where a city seeks to regulate "secondary effects" of speech, the city has the burden of "provid[ing] some factual support for its claim" that its speech restrictions advance its goals. *Cornerstone*, 948 F.2d at 469. To that end, "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality opinion) (quoting *Renton*, 475 U.S. at 51-52).

Indeed, *Cornerstone* teaches that a city must offer specific, concrete evidence in support of its claim that a content-neutral zoning ordinance furthers its interests. *Cornerstone*, 948 F.2d at 469-70. In that case, the city claimed that its ordinance furthered its economic interests, but it "never conducted any studies of the effects of churches on commercial activity." *Id.* at 469. Further, in two "conclusory" affidavits, the city gave only one specific reason for excluding churches—namely, "that a church would displace potential commercial uses and increase the potential for traffic, parking and land-use conflicts." *Id.* In these circumstances, the court found material issues of

genuine fact and reversed the district court's grant of summary judgment in favor of the city. *Id.* at 470.

Still, in other cases, courts have granted summary judgment to cities defending zoning ordinances designed to combat "secondary effects." *E.g., Jake's, Ltd., Inc. v. City of Coates*, 284 F.3d 884 (8th Cir. 2002); *Xiong v. City of Moorhead*, 641 F. Supp. 2d 822 (D. Minn. 2009). In *Jake's*, a case involving zoning of sexually-oriented businesses, the city relied on studies conducted by other municipalities and by the Minnesota Attorney General, as well as a memorandum by the city attorney regarding crimes allegedly related to the plaintiff's establishment. *Jake's*, 284 F.3d at 888. Although the plaintiff challenged the city's evidence, the Eighth Circuit found that it was adequate and affirmed summary judgment for the city. *Id.*

In *Xiong*, a case similar to *Jake's*, the city relied on studies and public testimony to justify its ordinance. *Xiong*, 641 F. Supp. 2d at 829-30. In rejecting the plaintiff's challenges to the reliability of the studies, this Court explained: "Requiring adherence to scientific standards of analysis would be inconsistent with the deference that municipal authorities are given to analyze and address community issues when acting in their legislative function." *Id.* at 828. This Court found that the city's evidence supported the ordinance, and it granted summary judgment in favor of the city as to the plaintiff's challenge of the city's supporting evidence. *Id.* at 830, 834.

Here, in light of *Cornerstone*, *Jake's*, and *Xiong*, the Court finds that summary judgment is inappropriate. As noted above, the City claims that the Zoning Ordinance's ban on "Assembly, religious institution, house of worship" uses in B-1 served the City's

economic and safety interests.  Ordinance 1401, enacted on January 28, 2014, created the

"Assembly, religious institution, house of worship" category and established the ban.

That Ordinance, however, is not in evidence, so the Court is not privy to any legislative

findings that Ordinance 1401 may include that would support the City's claim that the

ban furthers its interests.

That said, some evidence in the record supports a finding that the City's ban on

"Assembly, religious institution, house of worship" uses in B-1 is sufficiently linked to

the City's asserted interests for the purposes of the narrow-tailoring inquiry.  First,

according to the City Administrator, the City has monitored public safety related to traffic

near the Theater Property since at least 2004, and it commissioned traffic studies related

to the Theater Property in 2004 and 2011.  (Doc. No. 15 ("Bot Aff.") ¶¶ 13-20, Exs. C,

D.)  Second, the Findings of Fact and Decision relies upon specific, concrete evidence to

explain the City's safety interests in the ban—albeit after the ban was enacted.  (Findings

of Fact & Decision.)  Namely, the Finding of Fact and Decision points to statements by

traffic engineers, a 2014 traffic study related to the Church's proposed use of the Theater

Property, and a transportation engineering handbook.  (*Id.* ¶¶ 14-17, 19.)  Although the

question is close, viewing the facts in the light most favorable to the City, the Court

cannot conclude that the Church is entitled to judgment as a matter of law on the issue of

narrow tailoring.  Likewise, given the record, the City's motion is clearly unwarranted.

## ii.    Alternative Channels of Communication

If a content-neutral speech regulation is "narrowly tailored to serve a significant

governmental interest," then a court must consider whether the law "leave[s] open ample

40

alternative channels for communication of the information." *Cornerstone*, 948 F.2d at 469. To satisfy this standard, the relevant inquiry is whether the challenged regulation "effectively den[ied the plaintiff] a reasonable opportunity to open and operate [a church] within the city." *Renton*, 475 U.S. at 54. The fact that a church "must fend for [itself] in the real estate market . . . does not give rise to a First Amendment violation." *Id.* Further, the First Amendment does not compel governments "to ensure that . . . speech-related businesses . . . will be able to obtain sites at bargain prices." *Id.* And, "the available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." *Ross v. Early*, 746 F.3d 546, 559 (4th Cir. 2014) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)) (internal quotation marks and brackets omitted).

In short, the test for "alternative channels" is one of reasonableness and does not present a high hurdle for municipalities. In *Renton*, for example, the city's ordinance left 520 acres of land, constituting more than 5% of the city's land area, open to the use desired by the plaintiff. *Renton*, 475 U.S. at 53. Although the plaintiff argued that the land in question was not available, the *Renton* Court found that the city's ordinance allowed for reasonable alternative avenues for communication. *Id.* at 53-54. Similarly, in *Alexander v. City of Minneapolis*, 928 F.2d 278, 283 (8th Cir. 1991), the court found that the plaintiff had access to 6.6% of the total acreage of commercial land. Although the plaintiff provided evidence that he had tried—and failed—to relocate his businesses, the Eighth Circuit upheld the city's ordinance, explaining: "The City is not required by

41

the First Amendment to provide [the plaintiff] with an actual site available to relocate his theatres." *Alexander*, 928 F.2d at 284.

Here, the Court finds that that the Zoning Ordinance adequately allows for alternative channels of communication.  In 2014, "Assembly, religious institution, house of worship" uses were permitted in all four residential districts (R-1, R-2, R-3, and R-4). At that time, according to the City, these four districts had thirty-three parcels of land that could have accommodated a church.  (Weigle Aff. ¶ 4.)  In addition, these four districts had 2,767 acres of land, which made up 14.3 % of the zoned land in the City.  (*Id.* ¶ 20, Ex. 14 at 7.)  Although the Church submitted evidence that it has tried—and failed—to find a site that it can afford, this evidence does not provide a basis for the Court to conclude that the City denied the Church "a reasonable opportunity" to operate a church in the City.  *See Renton*, 475 U.S. at 53-54; *Alexander*, 928 F.2d at 284.

In sum, although the Court finds that Zoning Ordinance's ban on "Assembly, religious institution, house of worship" uses in B-1 serves a "significant governmental interest" and "leave[s] open ample alternative channels," it concludes that fact issues remain with respect to the "narrow tailoring" inquiry.  Specifically, the record before the Court lacks evidence of the facts upon which the City relied in enacting the ban.  In these circumstances, the Court concludes that neither party is entitled to summary judgment on Count 1.

## B.    Free Exercise

Next, the Court considers the Church's claim that the Zoning Ordinance, prior to its amendment, violated the Church's right to free exercise of religion.  According to the

Church, both the Zoning Ordinance's ban on "Assembly, religious institution, house of worship" uses in B-1 and Ordinance No. 1405's moratorium on "new or expanded assembly, theater or church purposes" violated the Church's free exercise rights.  (Doc. No. 74 at 28.)  It is well-established that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872,  878-79 (1990)).  Put another way, a law is subject to strict scrutiny, rather than rational basis review, if it:  (1) "place[s] a 'substantial burden' on" the practice of a religious belief, *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008); and (2) is not "neutral and generally applicable," *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008).

### 1.     Substantial Burden

To begin, the Church must raise a material question of fact regarding whether the City has imposed a "substantial burden" on the Church's ability to practice its religion. *Patel*, 515 F.3d at 813; *Vineyard*, 250 F. Supp. 2d at 985-86; *see also Cornerstone*, 948 F.2d at 472 ("[A] neutral law of general applicability that incidentally impinges on religious practice will not be subject to attack under the free exercise clause.").  "[A] burden must be more than a mere inconvenience to rise to the level of a constitutional injury; it must place significant pressure on [a plaintiff] to forego religious precepts or to engage in religious conduct." *Vision Church*, 468 F.3d at 999 (internal quotation marks omitted).  Indeed, no substantial burden exists if an ordinance merely makes the practice

43

of a religious belief more costly.  *Patel*, 515 F.3d at 813; *Vineyard*, 250 F. Supp. 2d at

987.  Further, as multiple courts have held, a religious plaintiff's inability to locate its

premises in a particular location, without more, does not establish a constitutionally

cognizable burden on free exercise.  *Lighthouse*, 510 F.3d at 274 & n.17 (collecting

cases); *Vineyard*, 250 F. Supp. 2d at 986 (same); *see also Cornerstone*, 948 F.2d at 472

(finding that a zoning ordinance that excluded a religious plaintiff from the central

business district had "no impact on religious belief").

Here, the Court finds that the Zoning Ordinance's ban on "Assembly, religious

institution, house of worship" uses in the B-1 district does not impose a substantial

burden on the Church's religious exercise.  Although the ban may impose monetary and

logistical burdens on the Church, it does not prevent the Church's members from

worshipping or engaging in activities central to their religious beliefs.  Indeed, it merely

prevents the Church from using a specific property for religious worship.  Because the

ban does not impose a substantial burden on the Church's religious exercise, the ban does

not violate the Free Exercise Clause.

However, Ordinance No. 1405, which established a moratorium prohibiting "the

use of any land for new or expanded assembly, theater or church purposes" for one year,

imposes a heavier burden on the Church's religious exercise than that imposed by the ban

on "Assembly, religious institution, house of worship" uses in B-1.  Namely, the

moratorium prevented the Church from using any property in the City for religious

worship.  As such, the Court cannot conclude that the moratorium does not impose a

substantial burden on the Church's religious exercise.

44

## 2. Neutral and Generally Applicable

If a law substantially burdens religious exercise, a court considers whether the law is neutral and generally applicable. A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 531. A law is not generally applicable if religious observers are subject to unequal treatment, namely, if "a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542-43.

In *Cornerstone*, the Eighth Circuit determined that a zoning ordinance similar to the Zoning Ordinance in this case was neutral and generally applicable and therefore survived a free exercise challenge. *Cornerstone*, 948 F.2d at 472-73. As noted above, the *Cornerstone* ordinance allowed churches in residential districts but prohibited them in the central business district, and the purpose of the prohibition was promotion of economic vitality. In these circumstances, the Eighth Circuit explained: "Absent evidence of the City's intent to regulate religious worship, the ordinance is properly viewed as a neutral law of general applicability." *Cornerstone*, 948 F.2d at 472.

Here, the Court finds that both the ban on "Assembly, religious institution, house of worship" uses in B-1 and the moratorium imposed by Ordinance No. 1405 are neutral and generally applicable. On its face, the ban applies to "Assembly, religious institution, house of worship" uses; thus, it prohibits both secular and religious assembly uses in B-1. Moreover, there is no evidence that the City had an anti-religious purpose. Rather, as explained above, the object of the ban on "Assembly, religious institution, house of

45

worship" uses in B-1 was to protect the City's economic interests and to promote public safety, particularly as it relates to traffic.

Similarly, the moratorium, on its face, applies to "assembly, theater or church purposes," which can be either secular or religious.  (Ordinance No. 1405 at § 1(2).) Although the City Council enacted the moratorium in response to concerns raised while considering the Church's Planning Application, there is no evidence that the City imposed the moratorium for the purpose of blocking the Church's use of the Theater Property because the proposed use was religiously motivated.  Instead, Ordinance No. 1405 explicitly states that the purpose of the moratorium was to examine "all issues, including but not limited to transportation, environmental and fiscal[,] . . . while protecting the City's planning process and the public health, safety and welfare."  (*Id.* § 2(6).)  This stated purpose is consistent with the Findings of Fact and Decision, which evidences the City's efforts to study traffic impacts that could stem from the Church's proposed use of the Theater Property.  Further, as contemplated by Ordinance No. 1405, the City examined assembly uses in multiple zoning districts—including potential traffic impacts—and considered possible options for amending the Zoning Ordinance.  (Study at 3-9.)  Indeed, the City relied on the Study when it enacted Ordinance No. 1506's amendments to the Zoning Ordinance.  Thus, the purpose of the moratorium was to study assembly uses, particularly their relationship to traffic; it was not to regulate religion.

### 3.    Rational Basis Review

Finally, the Court applies rational basis review.  With respect to the ban, the Court's findings that the ban does not substantially burden religious exercise and that the

ban is neutral and generally applicable each independently trigger rational basis review, rather than strict scrutiny.  With respect to the moratorium, the Court's finding that the moratorium is neutral and generally applicable triggers rational basis review.

Under rational basis review, "[a] statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not that basis has a foundation in the record."  *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (internal quotation marks, brackets, and citations omitted).  Here, both the ban on "Assembly, religious institution, house of worship" uses in B-1 and the moratorium imposed by Ordinance No. 1405 are rationally related to the City's efforts to prevent negative secondary effects of certain land uses, protect economic vitality, and promote public safety.  Accordingly, both are valid under rational basis review, and the Court grants summary judgment in favor of the City on Count 2.

## V.     Defamation

Last, the Court considers the Church's claim that the City's Statement regarding the Church's Planning Application gives rise to a cause of action for defamation.  Under Minnesota law, a statement is actionable in defamation if it is:  (1) false; (2) was communicated to a third party; and (3) tended to harm the plaintiff's reputation or to lower that person in the estimation of the community.  *Stuempges v. Parke, Davis & Co.*,

297 N.W.2d 252, 255 (Minn. 1980).  The City moves for summary judgment on this claim.[17]

## A.     Falsity

To begin, a defamatory statement must present or imply a false fact.  *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 308 (Minn. Ct. App. 2001).  "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."  *Id.* (internal quotation marks omitted).  Likewise, "[i]f the statement is true in substance, inaccuracies of expression or detail are immaterial."  *Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 441 (Minn. Ct. App. 1986).  "A statement is substantially accurate if . . . it produces the same effect on the mind of the recipient which the precise truth would have produced."  *Id.* (internal quotation marks omitted).  "Where there is no dispute as to the underlying facts, the question of whether a statement is substantially accurate is one of law for the court."  *Id.*

Here, the Court finds that a reasonable jury could find that the City's Statement is false.  The Statement included the following:

> However, despite several ideas and attempts from the City to resolve the
> traffic safety issues identified by the City's traffic consultant, Riverside
> would not agree to an enforceable worship space limit.  On Tuesday,
> November 25, 2014 Riverside notified the City in writing that it was

---

[17]     In its opposition to the City's motion, but not in the Church's own motion, the Church requests that the Court grant summary judgment in the Church's favor.  Although the Court acknowledges that it has discretion to enter summary judgment *sua sponte* under Rule 56(f), the Court declines to entertain the Church's request in this case.  *See* Fed. R. Civ. P. 56(f).

"withdrawing from future negotiations."  As a result, the City Council
denied the zoning amendment request.

(Statement.)  Evidence in the record suggests that the City's statement that "Riverside

would not agree to an enforceable worship space limit" is inaccurate.[18]  Specifically, on

November 22, 2014, the Church proposed a draft agreement with an attendance-based

limit of 1,200 people, and on November 24, 2014, the City responded with a revised draft

that maintained that limit.  These draft agreements suggest that the Church and the City

did in fact reach an agreement regarding a worship space limit.

Moreover, a reasonable jury could read the Statement as implying that Riverside

withdrew from negotiations with the City because the parties had reached an impasse

with respect to the worship space limit.  Again, evidence in the record suggests that this

implied fact is false.  In particular, in a letter dated November 25, 2014, the Church

indicated its intent to withdraw from negotiations with the City, stating that "major

changes" to the Church's November 22, 2014 draft agreement were "completely

unacceptable."  Because the City did not change the attendance-based worship space

limit in its changes to the November 22, 2014 draft agreement, the Church must have

been objecting to a different provision of the agreement.  Indeed, the Church's letter goes

on to advise the City of the Church's disagreement with the City's addition of a waiver of

the Church's rights to the draft agreement.  Thus, the evidence indicates that the Church

---

[18]     The City argues that this statement is a subjective opinion that cannot form the
basis of a defamation claim.  The Court disagrees, as the statement "present[s] or
impl[ies] a . . . fact"—namely, that Riverside refused to negotiate with the City—and that
fact can be proven true or false.  *See Schlieman*, 637 N.W.2d at 308.

did not, in fact, withdraw from negotiations due to a dispute with the City over the worship space limit.

### B.    Defamatory Meaning

The second element of a defamation claim is communication of the allegedly defamatory statement to a third party.  Here, the City's Statement was posted to the City's public website, so the second element is satisfied.  Accordingly, the Court will consider the third element, defamatory meaning.  A defamatory statement is one that tends to harm the plaintiff's reputation or "casts aspersions on [the plaintiff's] character." *Jadwin*, 390 N.W.2d at 443.  "Whether a statement is defamatory depends on how ordinary people would interpret its language in light of the circumstances."  *Holler v. Hennepin Cty.*, No. A15-0616, 2015 WL 7693563, at *6 (Minn. Ct. App. Nov. 30, 2015). Whether a statement is capable of a defamatory meaning is a question of law for the court, while whether a statement is actually defamatory is a question of fact for the jury. *Schlieman*, 637 N.W.2d at 307.[19]

In this case, the Court concludes that the Statement is capable of harming the Church's reputation.  The Statement explains that the City sought to impose a worship space limit for the purpose of limiting traffic and therefore protecting public safety. Asserting that the Church refused to negotiate a worship space limit could cause an

---

[19]    Defamation that affects a plaintiff in its "business, trade, profession, office or calling" is defamation per se and is "actionable without any proof of actual damages." *Stuempges*, 297 N.W.2d at 255.  Defamation per se describes a "rule of damages, not of defamatory meaning."  *Schlieman*, 637 N.W.2d at 307.  Accordingly, to the extent the Church asserts that the City engaged in defamation per se, such claim does not change the Court's analysis with respect to liability.  *See id.*

ordinary person to understand that the Church acted unreasonably and ignored the City's concerns about traffic and safety.

### C.      Immunity and Privilege

The City argues that it is protected from liability by the doctrines of official immunity and qualified privilege.  "[O]fficial immunity protects a public official who is charged by law with duties requiring the exercise of discretion unless that official acted willfully or maliciously." *Gunnink v. State*, No. A09-396, 2010 WL 10388, at *5 (Minn. Ct. App. Jan. 5, 2010) (citing *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990)). Official immunity, however, does not apply to defamation claims against public officials and government entities.  *Bauer v. State*, 511 N.W.2d 447, 449-50 (Minn. 1994); *Gunnink*, 2010 WL 10388, at *6.  Accordingly, official immunity cannot relieve the City from liability for defamation in this case.

The doctrine of qualified privilege may apply "if the defendant made the alleged defamatory statements in good faith and upon a proper occasion, from a proper motive, and based upon reasonable or probable cause." *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1143 (8th Cir. 2014) (internal quotation marks and ellipses omitted) (quoting *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997)).  Here, the Court cannot conclude, as a matter of law, that the City made its Statement "based upon reasonable or probable cause." *See id.*  As noted above, the November 22 and 24, 2014 draft agreements, as well as the Church's November 25, 2014 letter to the City, indicate that the City knew that the Church agreed to the City's proposed worship space limit and

knew that the Church withdrew from negotiations due to the City's proposed waiver provision.

In sum, issues of material fact preclude summary judgment in favor of the City. Accordingly, the Court denies the City's motion as to Count 6.

## CONCLUSION

While this lawsuit presents a justiciable controversy—and the Court is sympathetic to the Church's plight—the Court concludes that it must grant summary judgment in favor of the City on the majority of the Church's claims.  The City's ban on "Assembly, religious institution, house of worship" uses and its temporary moratorium were neutral laws of general application that passed rational basis review.  As such, the Church's free exercise claim fails (Count 2).  Further, the Church has abandoned its claim under the Minnesota Constitution (Count 3).  And, in light of the City's amendment of the Zoning Ordinance and issuance of a conditional use permit to the Church, the safe harbor provision bars the Church's substantial burden and equal terms claims under RLUIPA (Counts 4 and 5).

Still, issues of material fact preclude summary judgment in favor of either party on the Church's speech and assembly claim (Count 1).  Likewise, issues of material fact preclude summary judgment in favor of the City on the Church's defamation claim (Count 6).  Both liability and damages as to these claims will be determined at trial.  In the Court's view, however, given the record before the Court and the current status of the case, a resolution negotiated by the parties prior to trial would not only serve the interests

of both parties but would also further the interests of the public, including the City's residents and the Church's members.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1.     Defendant City of St. Michael's Motion for Summary Judgment (Doc. No. [54]) is **GRANTED IN PART AND DENIED IN PART** as follows:

      a.     The Motion is **GRANTED** with respect to Counts 2, 3, 4, and 5. Counts 2, 3, 4, and 5 are **DISMISSED WITH PREJUDICE**.

      b.     The Motion is **DENIED** with respect to Counts 1 and 6.

2.     Plaintiff Riverside Church's Motion for Partial Summary Judgment (Doc. No. [62]) is **DENIED**.

3.     Plaintiff Riverside Church's claims for declaratory and injunctive relief are **DISMISSED AS MOOT**.

Dated:  August 31, 2016                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge