## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Riverside Church, | Civil No. 15-1575 (DWF/JSM) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| City of St. Michael, | |
| Defendant. | |

---

Samuel W. Diehl, Esq., Dean A. LeDoux, Esq., Gregory R. Merz, Esq., and Matthew P. Webster, Esq., Gray Plan Mooty Mooty & Bennett, PA, and G. Craig Howse, Esq., and Jacob R. Grassel, Esq., Howse & Thompson, PA, counsel for Plaintiff.

George C. Hoff, Esq., and Jared D. Shepherd, Esq., Hoff, Barry & Kozar, counsel for Defendant.

---

## INTRODUCTION

This dispute arises from a city enforcing its zoning ordinances to thwart a church's attempts to purchase a movie theater for religious worship. The Court held a bench trial from October 18, 2016 to November 8, 2016, to determine whether the city violated the church's constitutional rights by preventing the purchase and whether the city defamed the church in a subsequent statement about the failed purchase.

Based upon the presentations of counsel, including all pre- and post-trial submissions, and the Court having carefully reviewed the evidence in the case, including all testimony and exhibits entered by the parties, and the Court being otherwise duly advised in the premises, the Court concludes that the city violated the church's

constitutional rights and that the city did not defame the church.  As a result, the Court

awards the church damages in the amount of $1,354,595.

## FINDINGS OF FACT

**I.     Background**

1.      Plaintiff Riverside Church ("Riverside" or the "Church") is a Christian

Missionary & Alliance church that currently meets for collective worship at a church

building in Big Lake, Minnesota (the "Big Lake Church").

2.      Defendant City of St. Michael ("St. Michael" or the "City") is a city and

municipal corporation in Wright County, Minnesota.

3.      Riverside's congregation assembles weekly each Sunday for collective

worship, which includes singing and preaching.

4.      Riverside's services are contemporary evangelical Christian worship.  The

Church incorporates into its services video and lighting, including projecting

pre-produced videos and slideshows onto movie screens.  (Trial Exhibit ("Ex.") P001.)[1]

The Church intentionally blocks windows in its main worship area so that lighting and

video elements are visible.  Riverside also simulcasts its services and makes its services

---

[1]      Plaintiff's Trial Exhibits will be designated with a "P" before the number, while
Defendant's exhibits will be designated with a "D."

available on the Church's website.  (P001, P006-7; Trial Transcript ("Tr.") 1243:23-1244:15 (Lee); 37:14-38:7 (Lundeen); 146:21-147:8 (Machmer).)[2]

5.      In 2004, Riverside's average weekly attendance at its Big Lake Church was approximately 675.  But, by the end of 2015, attendance had grown to approximately 1,600.

6.      Over the years, Riverside expanded and renovated its Big Lake Church and also added additional service times.  These efforts, however, were insufficient to meet the needs of Riverside's growing congregation.  (Tr. 48:10-25; 47:6-17 (Lundeen).)

7.      Riverside currently has maximum seating for 670 at its Big Lake Church divided between a primary auditorium and a video café where congregants watch a video simulcast of the live service in the main auditorium.  (Tr. 152:16-17 (Machmer).)

8.      Riverside first opened its video-café venue in 2005.  The Church uses this second worship venue like a movie theater.  Much like a movie theater, the video café provides elevated seating, which allows the congregants to clearly see the services being projected on movie screens.  (Exs. P001; P007; Tr. 46:24-47:5; 39:11-40:4 (Lundeen).)

9.      As Riverside grew, it began to consider adding a second worship location. Riverside studied the geographic areas from which it drew congregants.  The Mississippi River and Interstate 94 ("I-94") form natural barriers for attendees driving from areas south and east of the Big Lake Church.  To reach new members and to provide a

---

[2]      For ease of reference, citations to oral testimony will include the witness's last name after the citation in parentheses.

convenient site for the significant number of congregants from St. Michael, Albertville, Buffalo, Otsego, and surrounding communities, Riverside focused on locations along I-94 from Rogers to Monticello.  (P002; Tr. 53:23-55:3 (Lundeen).)

**II.      Riverside Identifies the Theater Property as a Possible Satellite Location.**

10.      In early 2014, Riverside identified the former Cinemagic Theater at 4300 O'Day Avenue N.E. in St. Michael (the "Property" or "Theater Property") as a potential location for a satellite to replay services by video from the Church's location in Big Lake. (D225.)

11.      The Theater Property is bordered to the east by I-94, to the north by Trunck Highway 241 ("TH 241"), to the west by O'Day Avenue ("O'Day") and the BNSF railroad tracks, and to the south by the Crow River and wetland/flood plain area.  The Theater Property sits in the southeast corner of the intersection of TH 241 and O'Day (the "Intersection").  The Intersection is located southwest of the I-94/TH 241 interchange. The current access to the Property's parking area includes a right-in/right-out access along O'Day south of TH 241 and a full access further south of TH 241.  The Intersection of O'Day and TH 241 has no traffic signals.

12.      In 2006, St. Michael approved construction of a 15-screen movie theater with nearly 2,800 seats on the Theater Property.  The capacity of the theater building is over 3,600 people and its interior area is more than 91,000 square feet.  (Complaint ¶ 43; Answer ¶ 26; Exs. P003, P015.)

13.    A movie theater operated at the Theater Property from late 2006 until September 2010, when the property fell into foreclosure.  (Complaint ¶¶ 52-53; Answer ¶ 34; Tr. 405:2-6 (Bot).)

14.    Riverside first heard that the Theater Property might be for sale at a discount price in 2011.

15.    In January 2014, Riverside learned that the Theater Property was officially for sale.  According to Pastor Thomas Lundeen, the Theater Property was an ideal property for Riverside.  Some of the perceived benefits of the Theater Property included its access to the interstate, its visibility, its large parking area, and the fact that it was ready for assembly use.  In January 2014, the Theater Property was listed for $2,695,000.

16.    St. Michael's Zoning Ordinance provided for different zoning districts and regulated the types of approved land uses as either "permitted" or "conditional" use. Until April 2015, the Zoning Ordinance did not permit "collective religious worship" in any of its business zones (B-1, B-2, or B-3) either as a "permitted" or "conditional" use. The Theater Property had been zoned B-1 since before 2013.

17.    In the B-1 zoning district, the following uses were allowed:

(a)    "Assemblies less than 250 persons in a one-day event, if approved by Zoning Administrator";

(b)    Government Buildings;

(c)    "Restaurants";

(d)    "Hospitals, funeral homes, and mortuaries";

(e)     "Professional Offices and Services including . . . day care . . . studios including art and photography, and other similar office uses";

(f)     "Retail Sales and Services including, but not limited to, . . . sporting goods, books, music, . . . on and off-sale liquor, convenience stores, department and discount stores, grocery stores, . . . hotel, motels."

2014 Zoning Ordinance § 155.105.

18.     In January 2014, Riverside Executive Pastor Skipp Machmer called Mark Weigle, the St. Michael's Community Development Director, to inquire about whether Riverside could use the Theater Property for what Machmer called worship.

19.     The testimony and record before this Court established that Weigle was the most knowledgeable City employee regarding zoning issues.  He reviewed, interpreted, and enforced the City's Zoning Ordinance and other land-use regulations.  He also was responsible for communicating with parties like Riverside about what the City's Zoning Ordinance means.  In this case, he was closely involved in the City's decision-making process regarding Riverside's efforts to purchase the Theater Property.

20.     Weigle informed Machmer in January 2014, during their phone call, that St. Michael's Zoning Ordinance did not permit Riverside to use the Theater Property for collective religious worship.  At the time of the January 2014 phone call, Weigle was not aware of how Riverside intended to use the Theater Property; all Weigle knew was that Riverside was a church.

21.     The seller accepted an offer from Cinemasota, Inc. for $1.75 million even though Riverside's offer was higher.  Despite initially losing out on the Theater Property,

Riverside continued to monitor the pending sale. In April 2014, Cinemasota offered to sell the Theater Property to Riverside for $1.75 million plus closing costs.

22.      With the new offer in hand, Riverside renewed contact with St. Michael regarding the Zoning Ordinance. But Riverside had a narrow window to work with the City as the sale had to happen before the closing on April 23, 2014. Riverside scheduled a meeting with the City for April 14, 2014. Prior to the April 14 meeting—and without inquiring further about Riverside's proposed use of the Theater Property—St. Michael's City Administrator Steve Bot stated in an internal e-mail, "I am a bit confused to the purpose of this meeting being we've told numerous local churches already that the old theater site is not zoned for a church." (P039.) Bot was described as the most senior staff member at the City.

23.      Weigle met with Riverside on April 14, 2014. At the meeting, Riverside explained that it intended to use the Theater Property as a satellite location where it would project a video simulcast of its services and sermons from the Big Lake Church. Weigle then understood that Riverside's proposed use was similar to the operations of a movie theater. But Weigle still told Riverside that its proposed use was not allowed in the B-1 zoning district. (*See* P041.) Weigle also testified that additional information— such as the number of auditoriums that Riverside intended to use—was unnecessary to determine whether the Zoning Ordinance allowed "collective religious worship" at the Theater Property. (*See* Tr. 652:25-643:11 (Weigle).)

24.     On April 24, 2014, Weigle sent an e-mail to Riverside stating that the City would "enforce the Zoning Ordinance as it is written," but that Riverside could consider asking "the City to amend the Ordinance to allow churches in the B-1 District." (P042.) Weigle also invited Riverside to attend an upcoming Planning Commission meeting. Cinemasota, however, had completed its purchase of the Theater Property a day earlier, on April 23.  Riverside stated that it therefore did not attend the upcoming Planning Commission meetings.

25.     After again failing to purchase the Theater Property, Riverside continued its discussions with Weigle and St. Michael City Attorney David Lenhardt.  As a result of these conversations, in mid-July 2014, Riverside submitted an application for a text amendment to the City Zoning Code requesting that the Zoning Ordinance be changed to allow Riverside to use the Theater Property.  Specifically, Riverside asked St. Michael to allow "assemblies, religious institutions, and places of worship" as permitted uses in the B-1 zoning district.

**III.     Riverside Attempts to Purchase the Theater Property.**

26.     On August 19, 2014, Cinemasota and Riverside entered into a purchase-and-sale agreement for the Theater Property.  Under the August 2014 purchase agreement, Riverside would pay $2,273,000 for the Theater Property.  The August 2014 purchase agreement also contained a buyer contingency for government approval by the closing in December 2014.

27.     Riverside arranged to finance the Theater Property through Alliance Development Fund ("ADF").  ADF required Riverside to obtain City approval to use the Theater Property before it would finance the purchase.

28.     On September 22, 2014, Riverside received a loan-approval letter from ADF approving a $3.2 million loan.  The loan-approval letter contained a zoning contingency.  In November 2014, the zoning contingency was replaced with a requirement of a signed agreement between Riverside and the City for occupancy.

29.     St. Michael's staff, the Planning Commission, and the City Council considered Riverside's application from approximately July 2014 through November 2014.

30.     Riverside informed the City that it had a three-phase plan for its worship areas at the Theater Property.  Riverside would immediately use one auditorium to seat 370 ("Phase 1") and also add a second video café in another auditorium with 100-150 seats ("Phase 2").  Then, as soon as it was needed, Riverside planned to combine two theaters which would provide a combined seating total of 750 ("Phase 3").  (P054 at 7; Tr. 190:11-193:20 (Machmer).)

31.     Riverside informed the City that during its three phases, the church intended to use another four of the fifteen auditoriums for children's programming on Sunday morning.

32.     In evaluating St. Michael's application, the City identified, in particular, issues of public safety and traffic impacts.  Bot testified that his concerns arose

immediately: "I started thinking about what, as I would with any proposed use there, . . . traffic implications would it have at this intersection that I know has issues and concerns." (Tr. 545:3-6 (Bot).)

33.     The only traffic study reviewed by the City when it considered Riverside's application was a traffic study dated October 30, 2014 (the "2014 Traffic Study"). The study was conducted by SRF Consulting ("SRF") and Marie Cote, a traffic consultant. The 2014 Traffic Study considered only Riverside's proposed use. According to Cote, the "purpose of the traffic impact study is to determine the total impacts from the proposed development on the roadway and intersections for all users." (Tr. 938:18-21.)

34.     Bot and Cote discussed the 2014 Traffic Study before it was conducted, and Bot requested that SRF review Riverside's peak use. The results of the 2014 Traffic Study concluded that once attendance levels reached 1,200 (the upper limit of Riverside's Phase 3 Plan), the Intersection would not function properly and begin to experience operational, queuing, and safety issues. This was the case, according to the study, even if the City were to put in a traffic signal. The parties argue over whether the 2014 Traffic Study was predicated on a sufficient foundation and methodology, and therefore valid. But more fundamentally, Cote and St. Michael acknowledged that the study's potential concerns may never become a reality at the attendance levels cited in the 2014 study. That is, Cote and St. Michael acknowledged that there was a possibility that there might never be any traffic safety issues with Riverside's proposed use of the Theater Property even if attendance reached 1,200 attendees. Cote testified:

Q.      And so if there's a new recession or a new building boom that nobody predicted, that might change the traffic, correct?

A.      Correct.  That is why we recommended in our 2014 study that after Phase III we should go in and collect data and make adjustments to our recommendations.  If by chance the volumes that are being generated based on the three services at St. Michael generates something less or more, then we would revisit the recommendations being made.

Q.      Right.  Let's go to Exhibit 121, that first bullet again on page 2. . . . So your analysis related to 1200 people was only used to determine when issues may begin and additional mitigation should be considered, correct?

A.      Correct.

Q.      And so things could change and 1200 could be fine.  And if we do a new study when we get to that point, that study could have different results, right?

A.      Correct.

Q.      And you don't know whether that study would show greater traffic impacts or less traffic impacts?

A.      Correct.

Q.      You would have to do the study in the future?

A.      Yes.[3]

35.     This Court finds that the 2014 Traffic Study did not establish that

Riverside's proposed use would present traffic and public safety concerns.  In fact,

as noted above, Cote herself suggested that if the Theater Property reached 1,200

attendees, then a new study would have to be done.

_____

[3]      (Tr. 1043:2-1044:4; *see also id.* 1131:9-15 (Cote).)

36.     On November 5, 2014, St. Michael's Planning Commission approved a document entitled "Findings of Fact and Recommendation."  (D262.) The Planning Commission's Recommendation identified issues with Riverside's proposed use.  These issues, with few exceptions, focused on traffic concerns. The Planning Commission recommended that the City not grant Riverside's application.

37.     On November 10, 2014, the Planning Commission's Recommendation was forwarded to the St. Michael City Council.  Rather than adopt the Recommendation or permit Riverside's proposed use, the City Council adopted a moratorium of new assembly uses.

38.     Ordinance 1405 (the "Moratorium Ordinance"), Section 1, provided, in part:

> The purpose and intent of this Ordinance is to prohibit:
>
> 1.      The issuance of any permit for the use of any land for new or expanded assembly, theater or church purposes;
>
> 2.      The filing or acceptance of any application for the use of any land for new or expanded assembly, theater or church purposes; or
>
> 3.      The occupancy of any land for new or expanded assembly, theater or church purposes.[4]

---

[4]      (P071 at § 1.)

The Moratorium Ordinance also stated that for up to one year, "the City shall not accept, issue or process any applications, permits, or otherwise allow the use of any land for new or expanded assembly, theater or church purposes."

39.     In the Moratorium Ordinance, St. Michael acknowledged that it had not studied assembly uses including collective religious worship.  Specifically, the Moratorium Ordinance stated in part:

> The City Council and the City Planning Commission have not yet had adequate opportunity to fully research, study and consider potential impacts the use or occupancy of any land within the city for the purpose of a new or expanded assembly, theater or church would have upon the health, safety and general welfare of the public.  The City Council authorized the study of these issues by the Planning and Zoning Department, and the City Planning Commission, to address or regulate the appropriate locations and the conditions under which assemblies, theaters and churches may be allowed within the city and is in need of the results of these studies before any newly enacted regulations can be adopted.[5]

40.     At the same time, St. Michael adopted Ordinance 1406, which amended the Zoning Ordinance by removing "Theaters (not outdoor drive-ins)" as a permitted use from the B-1 and B-2 zoning districts.  This Ordinance defined "Multi-Plex Theater" and allowed such theaters as a conditional use in the B-1 zoning district.

41.     Weigle, in a memorandum dated November 5, 2014, informed City officials:

> In general, the presence of a church in a commercial area might not always be a detriment and may sometimes be a positive. That lends itself to be

---

[5]     (*Id.* at § 1.)

more of a conditional than permitted use access, parking, adjacent uses, etc. which could include traffic studies to ensure the proposed use can be accommodated on that specific site.[6]

Weigle's November 5, 2014 memorandum also included a detailed list of "suggested conditions" in the event that St. Michael decided to allow Riverside on the Theater Property.

42.    On November 25, 2014, St. Michael denied Riverside's application and, in so doing, issued "Findings of Fact and Decision" ("Findings and Decision"). When viewed in context, the Court finds that these Findings and Decision did not evaluate new information, including information from Weigle, but did adopt the Planning Commission's Recommendation.

43.    At the same November 25, 2014 meeting, Weigle discussed the traffic concern raised by the 2014 Traffic Study regarding Riverside's proposed use of the Theater Property. But Weigle also suggested to the City Council that it could impose a 1,200-attendee limit to ensure public safety. Specifically, Weigle stated:

> The traffic engineer said . . . a limit for a worship service is anticipated to be 1,200 people and the City's position has . . . been that should be the limit then, that's the safe limit for that intersection, for that area. And, perhaps . . . if [Riverside] got close to that limit in the future it could be re-looked at, maybe there's a new interchange, maybe there's other changes that took place that would allow a higher limit, but for now, that's what the City can approve and still ensure the public safety.[7]

---

[6]    (P066 at SMDPA0053374.)

[7]    (D264 at 27:10-27:45.)

44.     The Court finds that on November 25, 2014, when the St. Michael City Council denied Riverside's Application, the Council was aware that there was a more narrowly tailored alternative available to address the City's traffic concerns.  Specifically, the City could have allowed Riverside to use the Theater Property with conditions.  Alternatively, the City could have allowed religious worship and other assembly uses in the B-1 zoning district as conditional uses with conditions that would allow the City to address its traffic concerns.  Weigle admitted this at trial:

> Q.     And on November 25th, 2014, you knew there was a narrower option available to the City than to prohibit religious worship in the entire B-1 zoning district, correct?
>
> A.     That certainly was one of the options that had been discussed, yes.[8]

45.     Riverside's August 2014 purchase agreement was scheduled to expire on December 2, 2014, and Cinemasota was unwilling to extend the agreement.  Without St. Michael's approval, Riverside could not obtain financing.  As a result, Riverside exercised its contingency and canceled the August 2014 purchase agreement with Cinemasota.

46.     Pursuant to the August 2014 purchase agreement, Riverside paid Cinemasota $675 per day from September 1, 2014, to the end of November 2014, for a total of $61,425.  Riverside also paid a professional planner, Bill Webber,

---

[8]     (Tr. 912:15-916:11 (Weigle).)

and traffic engineers SHE/Tom Sohrweide $7,595 to assist Riverside with the
City's application process.

**IV.    Riverside Tries Again to Purchase the Theater Property.**

47.     In 2015, Riverside again negotiated with Cinemasota and obtained
an option to purchase the Theater Property.  The option agreement was signed on
March 20, 2015.  The purchase price had increased to $3,558,575 plus the cost of
the expenditures that Cinemasota had made preparing to open the Theater Property
as a movie theater.  The March 2015 option agreement would expire on April 24,
2015, to allow Cinemasota the time necessary to prepare the Theater Property if
the sale to Riverside fell through.

48.     Riverside filed this lawsuit on March 23, 2015.

49.     On April 2, 2015, the City of St. Michael published official notice
that its Planning Commission intended to consider "an amendment to the
Ordinance that would add assemblies as a conditional use in the B-1" zoning
district.  On April 8, 2015, the St. Michael City Council passed Ordinance 1502.

50      Ordinance 1502 added assemblies, including religious assemblies, as
a conditional use in the B-1 zoning district.  Specifically, Ordinance 1502 added
the following definition to the Ordinance:

> ***Assembly*** - a group of persons gathered together for a particular purpose
> whether religious, political, educational, social or cultural. Types of

assemblies include movie theaters, concert halls, places of worship, funeral homes, day care facilities, conference centers and the like.[9]

51.     Pursuant to this amendment, Riverside applied for a Conditional Use Permit ("CUP") to operate its church at the Theater Property.

52.     The Planning and Zoning Commission held a public hearing on Riverside's Application on April 21, 2015, and recommended approval.

53.     On April 21, 2015, St. Michael issued a CUP to Riverside that allowed Riverside to use the Theater Property.  The City approved seating for 1,600; abandoning its earlier demand for a 1,200 attendance-limit.  The City also seemingly abandoned all of its earlier issues (big or small) that were identified as reasons to deny Riverside's 2014 application.  That is, the CUP did not impose any conditions relating to:  (a) engaging in commerce or commercial activity; (b) affecting surrounding property values; (c) being exempt from property taxes; (d) insisting on operating a school; (e) overburdening the City's law enforcement service capacity; (f) being unique and dissimilar in design and layout to other buildings in the B-1 zoning district; (g) TIF or a TIF district; or (h) releasing current or future rights under RLUIPA, the U.S. Constitution, the Minnesota Constitution, or any other law or statute.  (*Id*.)

54.     At trial, the parties argued over whether either side had pursued the correct mechanisms in seeking resolution.  But Weigle acknowledged that St. Michael could

---

[9]     (P091; Tr. 717:7-718:15 (Weigle).)

have passed an ordinance amendment in 2014 that was identical to its April 2015 amendment, Ordinance 1502. (Tr. 664:22-665:4 (Weigle).)

55.     On April 24, 2015, Riverside met with Cinemasota to agree on a final purchase price pursuant to the March 2015 option agreement. Cinemasota informed Riverside that the price would be at least $5,031,054.95, which included approximately $1.5 million of labor and equipment purchases.

56.     Due to the new price, Riverside could no longer afford to purchase the Theater Property, and therefore Riverside did not exercise the option. Cinemasota then began operating a movie theater at the Theater Property. At the time of trial, Cinemasota was operating 11 of the Theater Property's 15 theater auditoriums.[10]

## V.     Aftermath of the Riverside Dispute

57.     In 2015, St. Michael conducted a study related to "Assemblies, Theaters & Churches" (the "2015 Study"). The 2015 Study was completed in August 2015, and was drafted by Weigle.

The 2015 Study was the first time that St. Michael attempted to undertake a comprehensive study relating to zoning of assembly uses. The City ordered the study as part of its November 10, 2014 Moratorium Ordinance, Ordinance 1405.

---

[10]     Interestingly, at least from the Court's point of view given the history of the dispute, at the time of trial, the Crossing Church ("The Crossing") was renting four auditoriums at the Theater Property on Sunday mornings for religious worship services. The testimony at trial was that the Crossing was not required to renovate these auditoriums before using them for religious worship and children's services.

58.    The 2015 Study contained the "recommended definition" of assembly uses:

*Assembly* — a group of persons gathered together at regular, scheduled intervals for a particular purpose (e.g., religious, political, educational, social or cultural). Types of assemblies include movie theaters, concert halls, places of worship, funeral homes, schools, conference centers, and the like.[11]

59.    As relevant here, the 2015 Study also recommended that St. Michael's Zoning Ordinance regulate "movie theaters" and "places of worship" identically in the B-1 zoning district.

60.    Contrary to St. Michael's 2014 Findings and Decision, the 2015 Study concluded that the B-1 zoning district was compatible with large assembly uses, including places of worship. Specifically, the 2015 Study noted that:

The B-1 District is more compatible [than other zoning districts] for assemblies greater than 250 persons because infrastructure (roads, sidewalks, parking, etc.) has typically been designed and planned for retail activity, pedestrian access, and greater volumes of ingress and egress traffic. Allowing assemblies greater than 250 persons as a conditional use will enable the City to evaluate each assembly type use individually to address concerns depending on the size, location, schedule, time, type and other factors deemed relevant to protect the health, safety and welfare of the community.[12]

Moreover, in concluding that places of worship were compatible with the B-1 zoning district, the 2015 Study did not cite any concerns or regulatory impediments related to places of worship that had been cited in the 2014 Findings and Decision. (P105 at 18; Tr. 910:6-12 (Weigle).)

---

[11]    (P105 at 10.)

[12]    (*Id.* at 18.)

61.     The 2015 Study also recommended conditions that related to larger assembly uses (capacity for greater than 250 persons in the assembly areas).  Specifically, the study recommended that large assembly uses be required to:  (a) conduct a traffic study; (b) operate consistent with an operations plan approved by the City related to traffic issues identified by the traffic study related to the use and any accessory uses; and (c) modify this plan (and potentially conduct a new study) if the use intensifies.

62.     St. Michael passed Ordinance 1506 which essentially codified the 2015 Study's recommendations.  Now, under St. Michael's current zoning ordinance, the City allows the following uses in the B-1 zoning district as conditional or permitted uses:

(a)     Government Buildings;

(b)     "Library, Post Office, Museum";

(c)     "Place of Worship" with "250 or less persons in the assembly area(s)";

(d)     "Place of Worship" with "greater than 250 persons in the assembly area(s)";

(e)     "Preschool . . . licensed for 250 or less persons";

(f)     "Preschool . . . licensed for greater than 250 persons";

(g)     "Assemblies less than 250 persons in a one-day event, if approved by Zoning Administrator";

(h)     "Auditorium, Concert Hall, Movie Theater" with "250 or less persons in the assembly area(s)";

(i)     "Auditorium, Concert Hall, Movie Theater" with "greater than 250 persons in the assembly area(s)";

(j)     "Banquet/Conference/Meeting/Party Room, Commercial Recreation - Indoor, Sports Training" with "250 or less persons in the assembly area(s)";

(k)     "Banquet/Conference/Meeting/Party Room, Commercial Recreation - Indoor, Sports Training" with "greater than 250 persons in the assembly area(s)";

(l)     "Funeral Homes, Mortuaries";

(m)     "Restaurants";

(n)     "Retail Sales and Services including, but not limited to, . . . sporting goods, books, music, . . . on and off-sale liquor, convenience stores, department and discount stores, grocery stores, . . . hotel, motels."[13]

## VI.     Riverside's Defamation Claim

63.     In the lead up to the December 2, 2014 deadline for the August 2014 purchase agreement, the City and Riverside tried to negotiate a settlement based in part on Weigle's November 5, 2014 memorandum of suggested conditions for Riverside's purchase of the Theater Property.

64.     On Wednesday, November 19, 2014, the City sent a proposed settlement agreement that included an attendance limit of 1,200. On November 22, 2014, Riverside sent a counteroffer, which also included the 1,200 limit.

65.     The City responded with another counteroffer on November 24, 2014. In that offer, the City included a paragraph that granted the City the power to seek an injunction if necessary to enforce the settlement agreement. Specifically, the added paragraph (paragraph 6) stated:

---

[13]     (P033 at 98 ("September 2015 Zoning Ordinance") § 155.105.)

[The] City [may] obtain[] an injunction to enforce performance and observance of the Site Plan Conditions or any City regulation, policy, requirement, or ordinance.  To the extent City chooses to obtain said injunction, Riverside hereby consents to said injunction without City having to post a bond or other security and agrees to reimburse City for all reasonable attorneys' fees and costs associated with obtaining the injunction.  Riverside expressly, voluntarily and knowingly waives any claim that the entry of said injunction or its enforcement violates RLUPIA, the Minnesota or United States Constitutions, or any statute or other legal principle.

66.     In response to the City's offer, on November 25, 2014, Lundeen wrote a

letter to the City, its Mayor, and its Council Members, stating that Riverside was

withdrawing from negotiations and specified why:

After a review of [the City's changes to the Nov. 22 settlement proposal], we are withdrawing from future negotiations on the conditions on the use of the property. . . .  There is a fundamental violation of Riverside's constitutional and statutory rights occurring and now the City has drafted documents which require Riverside, a church, in paragraph 6 of the Site Plan Agreement to relinquish its rights under the United States Constitution to the free exercise of religion and the other legal rights that come with those First Amendment protections.

67.     After the August 2014 purchase agreement fell through, St. Michael

published a "Statement Regarding Decision on Riverside Church Zoning Application"

(the "Web Statement") on the City's website.  The Web Statement asserted that:

The City . . . attempt[ed] to reach an agreement that would have allowed Riverside to operate a church in the theater building under certain conditions that would address the traffic impacts the City's traffic consultant determined would result from the operation of a church at the theater building site.  This included a worship space limit of 1,200 people per service, which was the maximum number of people at one service the traffic engineers had determined would be safe, even after a traffic signal is in place at the Hwy. 241 and O'Day Ave. intersection. . . .

However, despite several ideas and attempts from the City to resolve the traffic safety issues identified by the City's traffic consultant, Riverside would not agree to an enforceable worship space limit. On Tuesday, November 24, 2014 Riverside notified the City in writing that it was "withdrawing from future negotiations." As a result, the City Council denied the zoning amendment request.

68.     A City Council Member, Chris Schumm, repeated aspects of the Web Statement on behalf of the City Council on Facebook.com. Schumm's post stated, in relevant part:

Just prior to the meeting the City received a letter from Riverside Church given [sic] formal notice that they are withdrawing from all negotiations with the City siting [sic] their Constitutional Rights being violated by the City which has been their claim from day one. Unfortunately, this negated weeks of hard work by Marc and Dave Lennart [sic] to attempt to compromise and reach an agreement that would protect the Health, Safety and Welfare of the City as our Council takes an oath to do. The primary sticking point is that the City did a traffic study which concludes that a church at the old theater location would cause traffic problems (even with a signal) when their service levels reach 1200 people. Although their planned full three phase build out only would seat around 750 people, Riverside church refused to agree to any limitations on how big their services would be siting [sic] we let a Mulit [sic]) Plex Theater have more capacity than 1200 but never acknowledging the difference in use, traffic, or legitimate safety concerns that would occur with huge church service attendance at a site with only one access. . . .

69.     Contrary to Schumm's statement and the Web Statement, the Court finds that Riverside had made a settlement offer with an attendee limit. Specifically, on November 22, 2014, during the course of settlement negotiations, Riverside sent the City a draft of a settlement proposal, including a provision requiring Riverside to: (1) keep track of its weekly Sunday worship service attendance; (2) notify the City and participate in a traffic study if more than 1,200 people attended the Sunday worship service for a

23

consecutive four-week period; and (3) implement restrictions reasonably necessary for the adjacent roadway to operate at generally overall acceptable levels of service after the traffic study.

70.     The Court finds that Riverside was willing to agree to limits on attendance at its worship services and that the City was aware of that fact when it published the Web Statement referenced above.  Additionally, the Court finds that Riverside withdrew because of the contents of paragraph 6 of the proposed Site Plan that related to the City's remedies in the event of default.

71.     The Court finds that the Web Statement was in fact false, but also concludes that, based on the record before it, the statement did not lower the reputation or image of Riverside in any way in the estimation of the community.

72.     That any conclusion of law which is deemed a finding of fact is incorporated herein as such.

Based upon the above findings of fact, the Court now makes its:

**CONCLUSIONS OF LAW**

**I.     Count I: First Amendment:  Freedom Of Speech And Assembly**

1.     Based on the evidence before this Court, the Court finds and concludes, as it did at the summary judgment stage, in light of *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir. 1991) and *City of Renton v. Playtime Theaters Inc.*, 475 U.S. 41 (1986), that the City's Zoning Ordinance served to regulate secondary effects of religious land use.  The Zoning Ordinance's stated purpose included "public health and

safety" and the "general welfare of the inhabitants of the City." Zoning Ordinance § 155.002. The stated purpose of the B-1 zoning district—where "assembly, religious institution, house of worship" uses were prohibited—included providing lands for business, office, and retail uses; strengthening the City's economic base; and providing employment opportunities. *Id.* § 155.205.

Consequently, the Court finds and concludes, as it did at the summary-judgment stage, that, based on the record before it, the Zoning Ordinance addressed significant government interests related to protecting the community's economic well-being and safety—particularly, safety related to traffic control.

2. Nonetheless, the Zoning Ordinance must also be narrowly tailored. The Court finds and concludes that St. Michael's Ordinance prohibiting collective religious worship in the City's B-1 zoning district until 2015 was not narrowly tailored. This conclusion is buttressed by the City's own 2015 Study, which recommended treating assemblies for religious worship exactly the same as theaters. The City's 2015 study represented an about-face from the City's Findings in November 2014. Consequently, the Court finds and concludes that the time, place, and manner of regulations were not narrowly tailored toward the City's governmental interest. The Ordinance burdened more substantially Riverside's speech than was necessary to further St. Michael's legitimate interests. The Court therefore concludes, based upon the record before it, consistent with its conclusions stated above, that St. Michael has failed to demonstrate that either of its challenged regulations—the 2014 Zoning Ordinance and the Moratorium

Ordinance—was narrowly tailored to serve their governmental interests.  Consequently, the Court concludes that St. Michael's Zoning Ordinance prior to 2015, prohibiting collective religious worship in the City's B-1 zoning district, does not survive the intermediate scrutiny standard.  *See Cornerstone*, 948 F.2d at 469.

3.     The Court therefore finds and concludes that by enforcing the Zoning Ordinance, the City violated Riversides' First Amendment constitutional right to freedom of speech and assembly.  As a result, Riverside lost the opportunity to purchase the Theater Property in November 2014 for $2,273,000.  Related to this lost opportunity, the Court also concludes that Riverside was required to pay holding costs to Cinemasota totaling $61,425 and costs related to its application to amend the Zoning Ordinance totaling $7,595.

4.     Claims under § 1983 draw their principles from a review of the common law of torts.  *E.g.*, *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017).  "Sometimes, that review of common law will lead a court to adopt wholesale the rules that would apply in a suit involving the most analogous tort."  *Id.*; *see also Carey v. Piphus*, 435 U.S. 247, 258 (1978) ("In some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right.  In such cases, it may be appropriate to apply the tort rules of damages directly to the § 1983 action.").

5.     Here, Riverside's claim is similar to a claim for tortious interference with a prospective contract.[14] Minnesota recognizes claims for tortious interference with a prospective contract, which allow the plaintiff to recover the pecuniary harm from the loss of the prospective contract. *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

6.     "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *E.g.*, *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). "Causation issues under § 1983 are analyzed under the common law." *Hackenmueller v. Fadden*, 196 F. Supp. 3d 992, 999 (D. Minn. 2016). Under Minnesota law for tortious interference with a prospective contract, the plaintiff must show that but for the defendant's interference, the plaintiff would have executed the contract. *St. Croix Printing Equip., Inc. v. Sexton*, Civ. No. 06-4273, 2008 WL 3412090, at *3 (D. Minn. Aug. 8, 2008)

---

[14]     The elements of the claim are:
(1) The existence of a reasonable expectation of economic advantage;
(2) Defendant's knowledge of that expectation of economic advantage;
(3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
(4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
(5) That plaintiff sustained damages.

*Gieseke*, 844 N.W.2d at 219.

7.     The Court finds and concludes that the Defendants' wrongful conduct prevented Riverside from purchasing the Theater Property for $2,273,000, pursuant to its August 2014 purchase agreement.  Instead, once the City had finally approved Riverside's use of the Theater Property, the purchase price was $5,031,054.95.  The new price represented the new contract price of $3,558,575 plus the additional costs that Cinemasota had incurred improving the property.  The new price proved to be too much for Riverside.  And as a result, Riverside lost the opportunity to own the Theater Property.

8.     The measure of damages for the tortious interference with a prospective contract is the pecuniary harm caused by the interference.  *See Gieseke*, 844 N.W.2d at 221 (noting that a defendant is liable "only for the expectation that the relationship eventually will yield the desired benefit, rather than the more speculative expectation that a potentially beneficial relationship will arise" (internal quotation marks omitted)); *see also Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 314-17 (6th Cir. 2011) (affirming jury verdict that awarded the increase in share price that the plaintiff had to pay to purchase a real estate investment trust as a result of the defendant's tortious interference).

9.     Here, the City's wrongful conduct increased the costs of the building by $2,758,054.95.  But the increase was not entirely caused by the City's action.  Instead, the increase was due in part to Cinemasota's efforts to prepare the Theater Property in case Riverside failed to purchase it.  (*See* Tr. 229:14-230:6 (Machmer).)  Because the improvements were not caused by the City's wrongful conduct, the costs of the

improvement must be subtracted out from the damage calculation. In this case, $1,472,479.95 is attributable to improvements performed on the Theater Property. (*See* P021.) Riverside's damages therefore are $1,285,575. The City's expert even acknowledges that $1,285,575 is the proper measure of Riverside's damages from losing the contract, even though the City disputes that this measure of damages is appropriate. (D234 at 4.)

10.    In addition, Riverside is entitled to recover the holding costs it paid pursuant to the August 2014 purchase agreement ($61,425) plus $7,595 for costs related to Riverside's application to amend the Zoning Ordinance.

11.    Riverside argues that its damages are closer to $9.5 million. Riverside comes to that calculation because it argues that the only substitute for losing out on the Theater Property is a new church priced at approximately $12.5 million. Riverside theorizes that if it had been able to purchase the Theater Property for $1.75 million (the amount discussed in April 2014) and paid the $1.2 million to repair the Theater Property, then it would have had a functioning church for just under $2.9 million. Riverside argues that Riverside therefore lost out on a repaired Theater Property because of the City's wrongful conduct. Riverside's claim for damages then is the cost of the new church ($12.5 million) less the $2.9 million it would have originally paid for the church, or roughly $9.5 million.

12.    Riverside's damage calculation, however, is flawed. First, Riverside relies on the price of the $1.75 million, but the City did not interfere with that agreement, if

there was one.  In April 2014, Cinemasota offered to sell the Theater Property to Riverside for $1.75 million plus closing costs, but the parties never signed a formal agreement.  Riverside hurriedly met with the City on April 14, 2014, regarding Riverside's possible purchase of the Property.  On April 24, 2014, Weigle e-mailed Riverside explaining that it did not believe that a church could be opened in the B-1 zone, but encouraged Riverside to petition the City to amend the ordinance at its next meeting. Riverside did not follow through because Cinemasota completed its purchase of the Theater Property one day earlier, on April 23, 2014.  Riverside argues that the City caused Riverside to lose the chance to purchase the Theater Property for $1.75 million. The April 24, 2014 e-mail, however, was not a final determination by the City, which is a predicate to Riverside bringing its claim.  See *Riverside Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1029 (D. Minn. 2016) ("In land use disputes—including those involving First Amendment and RLUIPA claims—ripeness requires a plaintiff to 'obtain a final, definitive position as to how it could use the property from the entity charged with implementing the zoning regulations.'" (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005)).[15]  As the Court found in its order on the City's Motion for Summary Judgment, Riverside did not receive a final determination until November 25, 2014, when the City denied Riverside's Planning Application.  *See*

---

[15]     In its Post-Trial Brief, Plaintiff argues that it was not required to seek a final determination from the City before bringing suit.  (Doc. No. 155 at 3.)  But a plaintiff claiming that zoning ordinances violated its constitutional rights usually must have a final, definitive position from the local government.  *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005).

*id.* at 1029-30.  Thus, the $1.75-million price is not the proper starting point for damages because the City had not yet made a final determination.  *See id.*  Instead, the final decision affected Riverside's August 2014 purchase agreement.

13.     And second, Riverside argues that its damages are the costs to create a new church, even though Riverside lost out on a dilapidated theater that needed many repairs.  For damages for tortious interference, a defendant is generally liable for only the lost benefit from the contract and not the more speculative possible benefits.  *See Gieseke*, 844 N.W.2d at 222 (noting that a defendant is not liable to a plaintiff for lost profits for unidentified, hypothetical customers).  Here, if the City had not interfered, Riverside would have been able to purchase the Theater Property for $2.27 million.  Instead, Riverside had the opportunity to buy the Theater Property for $3.5 million.  The repairs needed to make the Theater Property functional and therefore arguably on par with new construction are too speculative to award.  Thus, Riverside is not entitled to the amount necessary to build a new church because the proper measure of damages is the amount necessary to put Riverside in the same economic position it would have been had Riverside purchased the Theater Property in August 2014.  That is, the difference in price between the August 2014 purchase agreement and the March 2015 option agreement.

## II.     Count VI: Defamation[16]

14.     The Court finds, consistent with its findings of fact, that while the Web Statement was false, there is no evidence before this Court that the Web Statement

---

[16]     Counts II-V were dismissed at summary judgment.  (Doc. No. 84 at 53.)

lowered in any way the reputation or image of Riverside in the estimation of the community. Therefore, the Court declines to award any damages to Riverside for this Web Statement.

15.     Even if the Court had found that the Web Statement was false and defamatory, it was protected by qualified privilege.

16.     A statement is protected as qualified privilege when the statement is "made in good faith and must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause." *McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845, 854 (8th Cir. 2000) (quoting *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997).)

17.     "Reasonable grounds can exist if a person has valid reasons for believing a statement, even though the statement later proves to be false." *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 55 (Minn. Ct. App. 1995).

18.     Here, the evidence bore out at trial that the City had reason to believe that its statement was true. The City concluded that to enforce the agreed-upon audience limit, the City needed an enforcement mechanism. Accordingly, the City added a provision to provide for injunctive relief. Included in that provision was a waiver by Riverside that the City did not violate any of Riverside's rights by seeking an injunction. When Riverside refused the injunction provision, the City equated that decision with refusing the audience limit. While that conclusion may not have been correct, the City certainly had reason to believe it was true. Accordingly, the Court finds that the City's statement is entitled to qualified privilege.

19. Qualified privilege bars liability unless the privilege is abused. *E.g.*, *Ewald v. Wal-Mart Stores, Inc.*, 139 F.3d 619, 623 (8th Cir. 1998). A speaker abuses its qualified privilege when it makes a statement with actual malice. *E.g.*, *id.* Actual malice exists when the speaker makes a statement with "ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *E.g.*, *id.* Here, Riverside does not argue that the City made its statement with actual malice, nor does the record reflect that the City had any ill will toward Riverside in making the statement. Accordingly, the Court finds that the City's statement is protected by qualified privilege.

20. Additionally, even if the Court were to find that the City's statement was false and defamatory and not privileged, the Court concludes that Riverside has failed to prove it was damaged by the statement.

21. That any finding of fact which is deemed a conclusion of law is incorporated herein as such.

Based upon the above findings of fact and conclusions of law, the Court hereby enters the following:

## ORDER FOR JUDGMENT

In light of the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Consistent with this Court's findings of fact and conclusions of law, Riverside Church is entitled to judgment in the total amount of $1,354,595.

33

2.      **Attorney Fees**.  In light of the Court's decision, the Court respectfully directs that the parties meet and confer and agree on a briefing schedule for Plaintiff's motion for reasonable attorney fees and costs.  Once the briefs have been submitted and reviewed by the Court, the Court reserves the right to set oral argument.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 22, 2017              s/Donovan W. Frank
                                  DONOVAN W.FRANK
                                  United States District Judge